IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
May 2, 2002 Session

## HAROLD WAYNE NICHOLS v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Hamilton County**
**Nos. 205863, 213883-213896     D. Kelly Thomas, Jr., Judge, by Designation**

---

**No. E1998-00562-SC-R11-PD - Filed October 7, 2002**

---

The petitioner, Harold Wayne Nichols, filed post-conviction petitions seeking relief from his conviction for felony murder, his sentence of death, and his numerous convictions for aggravated rape, first degree burglary, and larceny upon the basis of ineffective assistance of counsel, as well as other legal grounds. After conducting several evidentiary hearings, the trial court denied relief as to the felony murder conviction and sentence of death, but granted partial relief by ordering new sentencing hearings as to the remaining convictions. The Court of Criminal Appeals concluded that the trial court erred by allowing the petitioner to assert his right against self-incrimination during the post-conviction proceedings, yet upheld the trial court's judgment in all other respects.

After reviewing the record and applicable authority, we conclude: (1) that the petitioner was not denied his right to the effective assistance of counsel based on the failure to investigate and challenge his confessions as false; (2) that the petitioner was not denied his right to the effective assistance of counsel based on the failure to challenge the legality of his arrest; (3) that the petitioner was not denied his right to the effective assistance of counsel at the sentencing phase of his capital trial based on the failure to present additional mitigating evidence; (4) that the petitioner was not denied his right to the effective assistance of counsel at the sentencing phase of his capital trial based on the failure to object to misconduct by the prosecution; (5) that the petitioner was not denied his right to the effective assistance of counsel at the sentencing phase of his capital trial based on the failure to request mitigating instructions; (6) that the petitioner was not denied his right to the effective assistance of counsel at the sentencing phase of his capital trial based on the failure to raise issues regarding the constitutionality of capital punishment; (7) that the petitioner was not denied his right to the effective assistance of counsel at the sentencing phase of his capital trial based on the failure to object to the discovery of notes prepared by a defense psychologist on self-incrimination grounds; (8) that the Court of Criminal Appeals did not err in refusing to remand the case for additional DNA testing; (9) that the Court of Criminal Appeals erred by addressing the issue of whether the petitioner had a right against self-incrimination in this post-conviction proceeding but the error had no effect on the outcome; and (10) that the trial court's findings were not clearly erroneous and cumulative

error did not require the reversal of the petitioner's convictions. Accordingly, we affirm the Court of Criminal Appeals' judgment.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed**

E. RILEY ANDERSON, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., J., filed a concurring and dissenting opinion.

Ardena J. Garth, District Public Defender, and Mary Ann Green, Assistant Public Defender, Chattanooga, Tennessee; Donald E. Dawson, Post-Conviction Defender, and Catherine Y. Brockenborough, Assistant Post-Conviction Defender, Nashville, Tennessee, for the appellant, Harold Wayne Nichols.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Gordon W. Smith, Associate Solicitor General; Gill Robert Geldreich, Assistant Attorney General; William H. Cox, III, District Attorney General; and C. Leland Davis, C. Caldwell Huckabay, and Glenn R. Pruden, Assistant District Attorneys General, for the appellee, State of Tennessee.

David M. Eldridge and Jeanne L. Wiggins, Knoxville, Tennessee, for *Amicus Curiae*, The National Association of Criminal Defense Lawyers and The Tennessee Association of Criminal Defense Lawyers.

**OPINION**

**BACKGROUND**

Procedural History

The petitioner, Harold Wayne Nichols, was convicted of felony murder and sentenced to death for the 1988 killing of 21-year-old Karen Pulley in Chattanooga, Tennessee. In imposing the death penalty, the jury found that Nichols had several prior convictions for violent felonies, including five aggravated rapes committed against four different victims. To place the issues in this post-conviction appeal in the appropriate context, we first summarize the extensive background facts and procedural history.

On September 30, 1988, the petitioner, Harold Wayne Nichols, broke into a home in the Brainerd area of Chattanooga and found the victim, Karen Pulley, alone in an upstairs bedroom. After forcibly removing Pulley's clothing, Nichols raped her and struck her in the head with a board he had found in the home. After the rape, Nichols struck the victim in the head with the board at least four more times as she struggled. Although Pulley was found alive by one of her roommates, she died the following day. The cause of death was the blunt trauma to the victim's head, which resulted in skull fractures and massive brain injuries.

Several months later, on January 5, 1989, police officers arrested Nichols after receiving information that he committed several rapes in the East Ridge area near Chattanooga that were unrelated to the Pulley rape and murder. When questioned by officers of the East Ridge Police Department on January 6, 1989, Nichols confessed to several rapes that occurred in December of 1988 and early January of 1989. When questioned later by Detective Richard Heck of the Chattanooga Police Department, Nichols confessed to the rape and murder of Karen Pulley and gave a videotaped statement in which he discussed the layout of the victim's home and bedroom, his entry point into the home, the facts of the rape and murder, and his disposal of the murder weapon.

Following these confessions, Nichols was first charged with and convicted of numerous offenses involving four different victims:[1] aggravated rape and first degree burglary committed against T.R. on December 27, 1988; aggravated rape and first degree burglary committed against S.T. on January 3, 1989; two counts of aggravated rape and first degree burglary committed against P.R. on January 3, 1989; and aggravated rape, first degree burglary, and petit larceny against P.G. on December 20, 1988. Nichols pled guilty to the offenses involving T.R. and S.T., but elected to go to jury trials for the offenses involving P.G. and P.R. and was convicted.[2]

After these convictions, Nichols pled guilty to charges of felony murder, aggravated rape, and first degree burglary for the offenses against Karen Pulley. At a sentencing hearing to determine the punishment for the felony murder conviction, the prosecution sought the death penalty based upon two aggravating circumstances: that Nichols had prior convictions for felonies involving violence and that the killing of Pulley had occurred during the commission of a felony. See Tenn. Code Ann. § 39-13-204(i)(2) and (7). The State introduced Nichols' five prior convictions for aggravated rape against T.R., S.T., P.G., and P.R., as well as his videotaped confession to the murder and rape of Karen Pulley.

In mitigation, the defense introduced evidence of the defendant's character and background. Reverend Robert Butler testified that he had known Nichols since his childhood and that Nichols had the "best quality" of character as a child. Winston Gonia, a minister who had known Nichols since age ten, also testified that Nichols was a good person. Similarly, Reverend Charles Hawkins testified that he had visited Nichols at an orphanage on many occasions and that Nichols had been a "very fine young man." Reverend Hawkins testified that he could not associate the crimes with the person he once knew.

A co-employee, Larry Kilgore, testified that he worked with Nichols at Godfather's Pizza and considered Nichols to be a dependable employee and a friend. Kilgore testified that Nichols had received promotions leading to assistant manager and worked night shifts and did paperwork.

---

[1] We will refer to these victims by initials only.

[2] The convictions for the offenses against P.G. and P.R. were affirmed by the Court of Criminal Appeals. State v. Nichols, No. 03C01-9108-CR-00236, 1995 Tenn. Crim. App. LEXIS 998 (December 19, 1995).

Kilgore was shocked at Nichols' arrest and said that the person who committed these crimes was not the person that he knew.

The defendant's wife, Joanne Nichols, testified that she married Nichols in 1986 and that he was a perfect gentleman who was nice, caring, and never mean to her. The couple lived for a time with Nichols' father, whom Joanne Nichols described as harsh and unloving. She testified that her husband worked late hours and sometimes did not come home all night. She did not think that Nichols raped and killed the victim because he never showed any indication that he would act in that manner. She admitted that she told an investigating officer that Nichols had said the murder was an accident. Finally, she testified that she did not want her husband to die.

Nichols, age 29 at the time of the sentencing hearing, testified about his family background. When Nichols was ten years of age, his mother died of cancer and he was placed in an orphanage by his father. Nichols did not know why he had been placed in the orphanage and did not recall any abuse taking place while he was there. When Nichols was about to be adopted in 1976, he was instead returned to his father with whom he had a difficult relationship.

Nichols joined the army and received an honorable discharge in 1984. He married his wife, Joanne Nichols, in 1986, and he believed they had a good marriage. Nichols testified that he had a prior conviction for assault with intent to commit rape and that he had a daughter through a prior relationship for whom he paid child support up until the time of his arrest. Nichols said that he enjoyed his job and had received promotions from cook to assistant manager.

Nichols testified that when he committed acts of violence, he had a "strange energized feeling" that he could not resist or stop. He conceded that he had never sought help for or told anyone about his criminal activity. He did not know Karen Pulley and intended only to burglarize her home and not to kill her. He knew Pulley was hurt during his attack but he did nothing to help her; instead, he disposed of the murder weapon and his clothing. Although he was remorseful, he admitted that he would have continued his violent behavior had he not been arrested.

Dr. Eric Engum, a clinical psychologist, testified that he met with Nichols five or six times and that Nichols was of "high average" intelligence and fairly articulate. He diagnosed Nichols with "intermittent explosive disorder," which is marked by an irresistible drive to commit a violent, destructive act until the act is committed. Dr. Engum testified that the condition may relate to organic factors or developmental factors such as a hostile environment, abuse, absence of love, and abandonment. In Nichols' case, there was the presence of a harsh, hostile father and the abandonment of being placed in an orphanage after his mother's death. Dr. Engum testified that Nichols was not a psychopath and was not always violent or evil; indeed, according to Dr. Engum, Nichols' confessions reflected his "good side taking responsibility for what [his] bad side did." Dr. Engum concluded that Nichols would function well in an institutionalized setting but would repeat the destructive behavior if released.

The jury imposed a sentence of death after finding that the evidence of the two aggravating circumstances outweighed the evidence of mitigating circumstances beyond a reasonable doubt. The trial court later imposed a 60-year sentence for the aggravated rape and a 15-year sentence for the first degree burglary, to be served consecutively. This Court affirmed the convictions and the sentence of death on direct appeal. State v. Nichols, 877 S.W.2d 722 (Tenn. 1994).[3]

## Post-Conviction Proceedings

In April of 1995, Nichols filed a petition for post-conviction relief seeking to set aside his felony murder conviction and death sentence. In December of 1996, he filed post-conviction petitions challenging all of the aggravated rape and related convictions in the non-capital cases. The main allegation underlying all of the post-conviction petitions was that the petitioner was denied his right to the effective assistance of counsel under the United States and Tennessee Constitutions.

The trial court conducted evidentiary hearings on the post-conviction petitions over the course of eight days, considered thousands of pages of records and documentary evidence, and heard testimony from dozens of witnesses. Nichols introduced extensive evidence in an effort to show that his trial counsel were ineffective in his capital and non-capital cases because they failed to investigate evidence of his innocence and failed to challenge his numerous confessions to all of the offenses. Nichols also introduced the testimony of numerous witnesses that he contends should have been presented as mitigating evidence in the penalty phase of his capital trial. Although the State called Nichols to testify in support of his allegations, Nichols invoked his constitutional right against self-incrimination and refused to answer questions.

The petitioner's trial counsel in all of the cases were Hugh Moore and Rosemary Bryan. Moore had defended defendants in two capital cases before representing Nichols and had published work in a capital defense manual. Bryan had worked on one prior capital case, had attended numerous seminars in criminal defense, and had a practice consisting of 40 to 70 percent criminal cases. Moore and Bryan presented time records indicating that they worked over 1,300 out-of-court hours and 259 in-court hours on the Karen Pulley case, in addition to over 650 out-of-court hours and nearly 30 in-court hours on the other cases.

Following the hearings, the trial court made detailed findings of fact and conclusions of law and denied post-conviction relief by upholding the felony murder conviction, the death sentence, and all of the non-capital convictions. The trial court, however, granted partial relief by ordering new

---

[3] The Court concluded that the jury's reliance upon the felony murder circumstance to impose the death sentence for felony murder violated article I, § 16 of the Tennessee Constitution for the reasons explained in State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), but that the error was harmless beyond a reasonable doubt. See Nichols, 877 S.W.2d at 739.

sentencing proceedings on the non-capital convictions.[4]  Although the Court of Criminal Appeals concluded that Nichols should not have been permitted to invoke his right against self-incrimination in these post-conviction proceedings and that a reviewing court is allowed to draw a negative inference from such a failure to testify, it nonetheless held that the evidence supported all of the other determinations made by the trial court and affirmed its judgment.

We granted this appeal.

## STANDARD OF REVIEW

The April 1995 petition challenging Nichols' conviction for felony murder and death sentence is governed by the Post-Conviction Procedure Act then in effect, which required that allegations be proven by a preponderance of evidence.  See Tenn. Code Ann. § 40-30-101, et seq. (1990).  The December 1996 petition challenging all of the convictions in the non-capital cases is governed by the more recent Post-Conviction Procedure Act, which requires that allegations be proven by clear and convincing evidence.  See Tenn. Code Ann. § 40-30-210(f) (1997).

A trial court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them.  State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).  When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve.  Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997).  When reviewing legal issues, however, or a mixed question of law and fact such as an ineffective assistance of counsel claim, the appellate court's review is de novo with no presumption of correctness.  State v. Burns, 6 S.W.3d at 461.

## INEFFECTIVE ASSISTANCE OF COUNSEL

To establish ineffective assistance of counsel under the Sixth Amendment to the United States Constitution and article I, § 9 of the Tennessee Constitution, a petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense.  See Strickland v. Washington, 466 U.S. 668, 692, 104 S. Ct. 2052, 2067, 80 L.Ed.2d 674 (1984); Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).  Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.  Id.

To prove a deficiency in counsel's performance, a petitioner must show that counsel's acts or omissions were so serious that they fell below an objective standard of reasonableness under

---

[4] The sentences for the convictions involving T.R., S.T., P.G., and P.R. originally amounted to an effective term of 647 years in the Department of Correction. The post-conviction court found that the sentencing in these cases did not comply with the procedures in State v. Pearson, 858 S.W.2d 879 (Tenn. 1993), and State v. Blouvett, 904 S.W.2d 111 (Tenn. 1995).  This part of the post-conviction ruling was not appealed by the State and therefore is not at issue in this appeal.

prevailing professional norms. <u>Strickland</u>, 466 U.S. at 688, 104 S.Ct. at 2064; <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975). As this Court has observed:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interests, undeflected by conflicting considerations. . . .

<u>Id</u>. at 934-35 (quoting <u>Beasley v. United States</u>, 491 F.2d 687, 696 (6th Cir. 1974) (citations omitted)). In reviewing counsel's conduct, a "fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689, 104 S.Ct. at 2065.

A key aspect of counsel's performance pertinent to the allegations raised in this case is counsel's duty to investigate. Defense counsel "must conduct appropriate investigations, both factual and legal," and "must assert them in a proper and timely manner." <u>Baxter</u>, 523 S.W.2d at 932, 935. As the United States Supreme Court has said, "counsel has the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Strickland</u>, 466 U.S. at 691, 104 S. Ct. at 2052. Although a defendant's statements or confessions do not eliminate counsel's duty to investigate, the reasonableness of counsel's actions "may be determined or substantially influenced by the defendant's own statements or actions." <u>Id.</u> at 691, 104 S. Ct. at 2066. Moreover, counsel's conduct must be "assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." <u>State v. Burns</u>, 6 S.W.3d at 462.

To establish that a deficiency resulted in prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct. at 2068. In short, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. <u>State v. Burns</u>, 6 S.W.3d at 463. In cases involving a guilty plea, a petitioner must establish that but for counsel's deficiency, he would have gone to trial instead of entering the plea of guilty. <u>Hill v. Lockhart</u>, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985).

## ANALYSIS

### I. <u>Ineffective Assistance of Counsel – Failure to Investigate</u>

The petitioner argues that he was denied his right to the effective assistance of counsel with respect to his felony murder capital conviction and with respect to all of his non-capital convictions. His underlying arguments are two-fold: that his trial counsel failed to investigate evidence of his innocence and failed to challenge all of his confessions in light of the evidence of his innocence. Nichols also argues that the Court of Criminal Appeals applied an incorrect standard of review by requiring him to prove his actual innocence of the offenses. We will review each of his underlying arguments and analyze them in light of trial counsel's conduct and performance.

## 1. Serology Evidence Regarding Karen Pulley and T.R.

The petitioner argues that his counsel were ineffective for failing to investigate serology evidence that excluded him as the perpetrator of the murder and aggravated rape of Karen Pulley, notwithstanding his guilty plea to the offenses. Relying upon a report prepared in 1989 by the Tennessee Bureau of Investigation, the petitioner argues that spermatozoa found in a vaginal swab taken from the victim, which did not contain A, B or H antigens, excluded him as the perpetrator because he is a blood type O secretor who produces H antigens in his bodily fluids.

Mike VanSant, a former T.B.I. serologist, testified at the post-conviction hearing that massive bleeding and blood transfusions may affect serological tests on blood samples but not on saliva or vaginal samples. Although VanSant testified that semen from a vaginal swab is distinguishable from blood even when the vaginal swab is bloody, he agreed that the blood flow will have a "cleansing action" over a period of time. He was then asked:

> Q. [B]ut just because there's a lot of blood, that doesn't hide the fact that there's semen there, that whatever antigens you would get from the semen?
>
> A: Not necessarily.

There was no further testimony or evidence following up on this issue; accordingly, given the equivocal nature of the evidence regarding whether massive bleeding may have had a cleansing action that affected the discovery of antigens, as well as the lack of expert testimony indicating that the petitioner was excluded as the perpetrator, the Court of Criminal Appeals concluded that the evidence was inconclusive.

Similarly, Nichols claims that serology evidence excluded him from the class of possible offenders in the aggravated rape of T.R., notwithstanding his guilty plea to the offense. In particular, he argues that saliva and vaginal swabs of the victim revealed the presence of a type B antigen and that he and the victim were both type O secretors who secreted only type H antigens.

VanSant testified that as a T.B.I. serologist in 1989, he tested a saliva sample taken from T.R., which revealed a B antigen, and a vaginal sample, which revealed B and H antigens in three of four tests and only an H antigen in one of the four tests. He indicated that he did not test the saliva sample for semen and that the results were therefore inconclusive. Although VanSant agreed that it was a "definite possibility" that the rapist was a type B secretor, he testified that he also found a sample of spermatozoa on the victim's bedspread that contained only type H antigens. According to Van Sant, the type H antigen could only have been produced by the victim, Nichols or any other type O secretor; moreover, although the type B antigen must have been produced by someone other than the petitioner, its presence did not exclude the petitioner or anyone else as the perpetrator of the offense.

VanSant testified that he was unaware at the time he performed his analysis that the victim had sexual relations three days before the offense:

> [T]here were seven areas of stain on the bedspread . . . . Had I known that she had voluntary sexual intercourse previously I would have tested maybe two or three different areas to try to find something different than the H [antigen] because, you know, I can't say, that could just be hers.

Although VanSant said he would not expect to find antigens in a sample three days after sexual intercourse, he acknowledged that the relevant "literature" states that antigens may be found up to nine days later. After reviewing all of the evidence, the Court of Criminal Appeals again determined that the evidence was inconclusive.

### 2. Murder Weapon

The petitioner contends that his counsel were ineffective because they failed to investigate the circumstances concerning the officers' discovery of the alleged murder weapon. As stated above, Nichols' confession to the murder and rape of Karen Pulley indicates that he gave a detailed description of the route he used in fleeing the scene and of the area in which he had disposed of the two-by-four by throwing it out of his car window. According to Detective Heck, the petitioner accompanied officers to the scene and a board was found that the petitioner stated "looked like the one he threw out the window of his car."

At the post-conviction hearing, Steve Miller, an officer with the Chattanooga Police Department, testified that he did not find a two-by-four board in his search of the area where it was later found. Susan Saunders Massey, who was Karen Pulley's roommate, testified she was taken to the area by police and saw a two-by-four leaning against a tree. She did not recognize the board but believed there had been a two-by-four in their home under a washer that was being repaired. Finally, Dr. Neal Haskeall, a forensic entomologist, testified that no blood or fiber evidence was found on the two-by-four that linked Nichols to the murder of Karen Pulley. He also found no evidence of plant material even though the board was allegedly discarded by the petitioner in September of 1988 and not recovered until January of 1989.

### 3.      Hair Evidence

The petitioner argues that his counsel were ineffective for failing to investigate hair samples collected from the Karen Pulley crime scene; in particular, evidence at the post-conviction hearing indicated that two slides containing several samples from the pubic area of the victim each revealed one hair that was inconsistent with Pulley or Nichols. The petitioner argues that the evidence may have established reasonable doubt inasmuch as the evidence also showed that the victim had never had sexual intercourse before the rape.

As the Court of Criminal Appeals observed, the report prepared by Forensic Science Associates and relied upon by Nichols was not dated until after the post-conviction hearings concluded; thus, the State had no opportunity to contest the issue and no expert witness testified as to the result. In any event, the report itself stressed that because "hairs are ubiquitous in the environment, degrade very slowly, and are easily inadvertently picked up, transferred, or shed, a loose hair is of relatively little significance without some independent knowledge that it is related to the incident being investigated." The evidence showed that Karen Pulley lived with two other women from whom hair samples were not evaluated as reference samples as part of the forensic evaluation now relied upon by the petitioner.

### 4.      Alibi Defense

Nichols contends that his trial counsel were ineffective for failing to investigate evidence of alibi defenses for all of the offenses. During post conviction, Nichols cited evidence that he was at work at the time an offense was committed against T.M. – an offense not at issue in this post-conviction proceeding – and argued that the evidence of an alibi for this offense should have prompted his trial counsel into investigating defenses for all of the other offenses to which he gave false confessions. The record indicates, however, that Nichols confessed and later pled guilty to the offense against T.M., and was also identified by T.M. as the person who attacked her. Although the petitioner argues this "rock solid" alibi should have prompted trial counsel to investigate alibi defenses in the other cases, he did not present any alibi evidence at the post-conviction hearing regarding any of the offenses at issue in this proceeding.

### 5.      Other Evidence and Suspects

The petitioner argues that his counsel were ineffective for failing to investigate that a pistol recovered from the trunk of his car did not match the description of a "blue steel revolver" used in the offense against S.T. The record reflects that Nichols confessed to the offense against S.T. and entered a guilty plea; before the plea was entered, the prosecutor stated that S.T. had identified Nichols from a photograph and that Nichols had consented to a search of his car that revealed a .38 revolver belonging to S.T.

According to Dwight Short, a witness presented at the post-conviction hearing by the petitioner, a property sheet prepared by police officers indicated that the pistol was an "Auto SST," which he interpreted to mean a stainless steel automatic. Short also testified, however, that the serial number recorded for the pistol on the property report was traced to a "three inch .38 Ross revolver with a blue finish."

In addition, the petitioner argued that his counsel were ineffective for failing to investigate a suspect named Fred Coats because there was evidence that a police dog tracked a scent from P.R.'s residence following the offense to a car owned by Coats' mother and that P.R. had identified Coats. The record reveals, however, that during the aggravated rape trial of P.R., the victim testified that she saw a photograph of Coats in which there were features that resembled the perpetrator. After later seeing Coats in a lineup, however, she told the officers he was not the rapist. She also testified that she identified Nichols as the one who had raped her, and she made an in-court identification of him at trial. The petitioner asserted that the defense failed to pursue other possible suspects as well.

### 6.    Ofshe Deposition

In addition to presenting evidence of alleged innocence, Nichols presented the deposition of Dr. Richard Ofshe, a Ph.D. in sociology, who teaches, works, and researches in the field of police interrogations and false confessions. Ofshe discussed "coercive" interrogation techniques, which can lead to false confessions through the making of threats or promises, and "persuading" interrogation techniques, which can lead to false confessions by convincing an innocent suspect that he or she committed the crimes. Ofshe testified that numerous factors must be reviewed in analyzing the nature of the interrogation and the veracity of a confession: whether a confession has been recorded in its entirety; whether the confession contains any details uniquely known to the defendant; whether the confession has been tainted or contaminated by an officer telling the suspect the facts of the offense; and whether the confession is corroborated by other evidence.

After reviewing Nichols' confessions, Ofshe determined that there were no indications as to how the statements came about or whether they were reliable. In Ofshe's view, trial counsel should have investigated whether officers told Nichols that he would receive "treatment" in exchange for his statements, whether officers "rehearsed" Nichols' statements before recording them, and whether Nichols had requested an attorney. Ofshe testified that there were no indications in the record that trial counsel had investigated the circumstances of the confessions, despite the lack of physical evidence, and that any attorney who fails to conduct an investigation cannot competently advise a defendant on whether to plead guilty or go to trial.

Ofshe acknowledged that at the time of the offenses, confessions, and convictions in this case, his field of study was in its earliest stages with regard to research and publication. Ofshe did not testify regarding any of Nichols' traits or characteristics that may have made him susceptible to undue pressure or risk of giving a false confession under the interrogation techniques he had described. Ofshe admitted that he never met with the petitioner.

Applying Ofshe's framework, the petitioner asserts that his confessions bore several indicia of falsity and unreliability. For instance, he contends that his confessions to the offenses against T.R., S.T., P.G., and P.R. were coached by East Ridge investigators who used leading questions to elicit one-word responses in a short period of time. He also asserts that the interrogation was contaminated by the fact that investigators showed him incident reports of the offenses and prompted him with regard to details. Similarly, the petitioner now argues that his confession to the Pulley offenses was coached by Detective Richard Heck of the Chattanooga Police Department and contained details that were inconsistent with the actual facts of the investigation.

## B. Counsel's Conduct

Hugh Moore, lead counsel for Nichols, testified that he reviewed files and records, talked to investigating officers, interviewed witnesses, and visited the crime scenes. He was aware the prosecution's strategy was to obtain convictions for the rapes and then to use those convictions in seeking the death penalty for the murder of Karen Pulley, and he argued at trial and on appeal that the procedure was improper because the rape offenses had occurred later in time.[5] When asked whether he had considered filing a motion for a speedy trial on the Karen Pulley charges, Moore said he was concerned such a strategy would reduce the amount of time in which they had to prepare for the capital charge.

Moore conceded that the guilty pleas were entered with respect to the charges against S.T. and T.R. before the petitioner had received an independent psychiatric examination. He stated, however, that there been no evidence to support a mental incapacity or insanity defense when Nichols was examined by state-employed mental health professionals following the charges. Moore conceded that he did not cross-examine the victims in the trials of P.G. and P.R., and therefore did not ask them about their identifications of the petitioner or other possible suspects.

Moore was questioned about the defense's consideration of various issues such as serology reports, hair samples, other possible suspects, weapon description, and other matters. He did not recall exactly why the defense had not pursued DNA testing, but expressed concern that a result adverse to Nichols could have been used against the defense. Although Moore was unable to recall some details relating to the investigation, he reiterated several times that the strategy had been shaped by Nichols' numerous confessions to the charged offenses, including the murder and rape of Karen Pulley.

Moore and his co-counsel spent nearly 70 hours meeting with Nichols in prison, during which Nichols consistently confirmed his statements to officers. Moore concluded that Nichols had said nothing to indicate the confessions were false or had been coerced and that investigation of other suspects "did not seem fruitful." When they were unsuccessful at having Nichols' statements suppressed, counsel focused upon presenting a mitigating defense to the death penalty, a strategy

---

[5] On direct appeal, this Court found no procedural or constitutional error with respect to the prosecutor's exercise of discretion in this regard. State v. Nichols, 877 S.W.2d 735-36.

with which Nichols was familiar and understood. Moore did not believe that any of the evidence at the post-conviction hearing would have changed Nichols' decisions to plead guilty or the defense's mitigation strategy.

Rosemary Bryan, co-counsel, testified that her investigation included numerous conversations with Nichols, reviewing the prosecution's files, interviewing police officers, and attempting to interview the victims of the rapes, who declined to speak with her. Bryan admitted that Nichols pled guilty to two of the rapes, T.R. and S.T., because he wanted to "get them over with" and because other charges were dismissed in return. She admitted that although these guilty pleas were entered prior to Dr. Engum's examination of Nichols, the petitioner had already been examined by Dr. Nickerson, who had found no basis for a competency or insanity issue. Bryan could not recall why the cases involving P.G. and P.R. went to trial or why the victims were not asked about other possible suspects. She believed that P.R. was not asked about Fred Coats as a possible suspect because the victim's direct testimony fully explained why she had misidentified Coats.

Bryan testified that the petitioner had admitted the facts against him in "great detail" and that he never told her the confessions were false or coerced. She described Nichols' statements to her about the offenses as "very vivid," containing facts that only he and the victims would have known. Bryan testified that the defense investigated many of the issues raised by Nichols in post-conviction, such as the victims' identifications of the petitioner, the suppression of statements, and possible alibi defenses. With regard to possible alibi defenses, for example, Bryan testified:

> Another thing we were aware of is that [Nichols] was clocked in some of the times that some of the rapes were supposed to have occurred, but I talked to [Nichols] about those things. . . .
>
> There was one, and it may have been [T.M.], where he supposedly could not have done it according to his wife. Well, I spent many, many hours talking to [Nichols and his wife] about this time thing and was this really a defense we had and it turned out it wasn't and again I don't remember why. It was either he was clocked in but he had [gone] to deliver a pizza.

Bryan testified that "there were things like that . . . we looked at and tried to ascertain if they would be helpful and they weren't . . . ." She concluded that challenging all of the confessions as false would have been "ludicrous" and would have required that the defense "manufacture a defense."

Although she and Moore investigated all of the offenses, Bryan said that most of their work was on the death penalty case and that Nichols played a knowing, active role in formulating the defense strategy. Bryan said that the defense focus became mitigation but that she and Moore very carefully decided what witnesses to present in the penalty phase. She believed that the petitioner's family were not as cooperative with regard to testifying at trial as they appeared to be in post-conviction.

Michael Cohan testified that he worked with lawyers Moore and Bryan as an investigator. Cohan, who had years of experience in law enforcement before becoming a private investigator, recorded 163 hours locating and interviewing witnesses and over 50 hours discussing the defense with counsel. Cohan testified that Nichols told him extensive details about his attack on Karen Pulley that corroborated the facts he had told investigating officers, as well as additional facts. Cohan testified that he worked primarily on the Pulley offense but also worked on the other cases when requested to do so by trial counsel.

## C. Findings and Conclusions

### 1. Karen Pulley Offenses

After reviewing all of the testimony and evidence from the trial and extensive post-conviction hearings, the trial court determined that the ineffective assistance of counsel claim with respect to the Karen Pulley offenses was without merit:

> Trial counsel and investigator Cohan testified that any allegation that counsel should have more fully researched the possibility of a false confession was 'ludicrous.' The petitioner gave very detailed statements to trial counsel separate from his statements given to the police. Trial counsel testified that they thoroughly discussed the options available with the petitioner and that the petitioner understood that his confessions would be very damaging evidence at the guilt phase. They advised him that if he entered a guilty plea and took responsibility for his actions that the jury might take this into consideration in the penalty phase despite the obviously weighty aggravating factors. Under all the circumstances, the decision to plea was a strategic decision which will not now be questioned using 20-20 hindsight. It is also noted that counsel's time records 'speak for themselves' as to the substantial amount of time expended by counsel on this case.

We agree with the Court of Criminal Appeals that the evidence in the record does not preponderate against the trial court's factual findings. With respect to the murder and rape of Karen Pulley, trial counsel testified regarding their investigation and defense strategy, which they admitted was influenced by Nichols' confessions. The petitioner's detailed and emotional videotaped confession to the murder and rape, for instance, described the victim's house, the petitioner's point of entry, the layout of the bedroom, and the facts of the rape and murder. The petitioner also consistently admitted his guilt regarding the Pulley offense to his counsel, investigator, and mental health expert. As we have noted, it is entirely reasonable for counsel's actions to be influenced by a defendant's own statements. See Strickland v. Washington, 466 U.S. at 691, 104 S. Ct. at 2066 (stating that reasonableness of counsel's actions "may be determined or substantially influenced by the defendant's own statements or actions").

-14-

In addition, the record reveals substantial evidence corroborating the testimony of trial counsel and the defense investigator. At the sentencing phase for the rape and murder, for example, Nichols admitted that he broke into the victim's home, raped her, and killed her when he was trying to leave. The petitioner's wife also indicated that she had asked about the Karen Pulley offense and that the petitioner told her that it was an accident. Dr. Engum's testimony at sentencing also indicated that Nichols had committed the offenses against Karen Pulley.

Nichols continued to admit his guilt even after the sentencing hearing. Bryan testified, for example, that the petitioner met with Karen Pulley's mother after the death sentence had been returned and in a brief but emotional meeting, "apologized over and over for what he had done to her daughter . . . ." Similarly, the petitioner's uncle, Claude Nichols, testified during post conviction that he visited his nephew in prison after the Karen Pulley trial and that he admitted the crimes. Lastly, Dr. David Solovay, a clinical psychologist relied upon by the petitioner in this post-conviction proceeding, indicated that the petitioner had expressed his guilt and remorse.

Despite his confessions and statements, the petitioner's main argument is that his confessions should have been challenged as false because they contained inaccuracies and omissions and because there was evidence of his innocence. The argument is immediately undercut, however, by the fact that the petitioner never refuted his confessions or his own statements to his trial counsel and others. As the Court of Criminal Appeals stated, it is in this context in which trial counsel's conduct must be viewed:

> [W]e will first consider the situation in which trial counsel found themselves at the time of the petitioner's trials. The petitioner had given multiple confessions to the offenses with which he was charged . . . . The petitioner's statements to both trial counsel, as well as their investigator, were consistent with his confessions to law enforcement officers. Trial counsel's motions to suppress the confessions was unsuccessful. <u>The petitioner has not attempted to explain how, in view of his continuing to assert that the confessions were true, trial counsel could have effectively presented a 'false confession' defense</u>.

(emphasis added).

The evidence presented at post-conviction did not alter the fact that the petitioner consistently admitted his guilt and never provided a basis for a false confession defense. Nichols never told his counsel, for example, that the confession to the Karen Pulley offenses was false or coerced. Morever, there was no evidence presented at post-conviction indicating that the petitioner suffered from a mental impairment, intellectual deficiency, or other condition that rendered him prone to being led or confessing falsely. Although Dr. Ofshe discussed the issue of false confessions in general, he never met the petitioner and did not address any of the petitioner's own characteristics. Indeed, as the intermediate court noted:

-15-

There was not, and has never been, a showing that the petitioner was susceptible to suggestions and pressure and might have been led into giving false confessions. In fact, had trial counsel tried to present such a claim, they would have been confronted by proof showing that the petitioner was twenty-eight years old and married, with three previous felony convictions and time spent in the Tennessee prison system. Thus, he could not have claimed youth and inexperience as reasons for falsely confessing.

Accordingly, when viewed in the appropriate context – that applicable to trial counsel at the time of their representation – we agree with the trial court's conclusion that the evidence presented during the post-conviction failed to establish that trial counsel's performance was deficient. The evidence showed that counsel and their investigator put thousands of hours into the investigation of the offenses and considered numerous issues and the viability of several possible defenses. They had numerous meetings and conversations with the petitioner, who was aware of and understood the evidence of his guilt and the strategy used in his defense. While the lens of hindsight indicates that trial counsel could have developed some of the issues more fully, such as the serology and the absence of physical evidence on the alleged murder weapon relating to Karen Pulley, Nichols still confessed and the issues were fully litigated by the post-conviction trial court. In sum, as the trial court found, nothing at post-conviction established that trial counsel's representation fell below an objective standard of reasonableness either in failing to investigate evidence of innocence or in failing to challenge the confessions as false when viewed in the context of the petitioner's own confessions and statements of guilt.

In addition, we also agree with the Court of Criminal Appeals' conclusion that the petitioner failed to show any prejudice under the second prong of the analysis with respect to his guilty plea to the offenses involving Karen Pulley.[6] As we have pointed out in great detail, the record reveals that Nichols confessed to the offenses against Karen Pulley and that he knowingly and voluntarily entered pleas of guilty. The petitioner was well aware that the defense strategy was to accept responsibility for his actions and focus on mitigating evidence. Moreover, given his confessions and the consistent statements of guilt he made to his trial counsel and others, it would be speculation to find that the evidence at the post-conviction, which did not exclude Nichols as the perpetrator or otherwise establish a defense, would have resulted in a decision to proceed to trial instead of pleading guilty. See Hill v. Lockhart, 474 U.S. at 59, 106 S. Ct. at 370.

## 2.    Non-Capital Convictions

---

[6] The petitioner vigorously asserts that the Court of Criminal Appeals applied the incorrect standard by requiring him to show "actual innocense" to establish prejudice. We disagree. The appellate court first noted that the evidence presented at the post-conviction was inconclusive and therefore failed to show that counsel's representation was deficient. The appellate court then determined that any deficiency was not prejudicial by properly finding that there was no reasonable probability of a different outcome.

-16-

The trial court's findings with respect to counsel's performance in the rape cases involving T.R., S.T., P.G., and P.R. were nearly identical to its findings with respect to counsel's performance in the Karen Pulley cases, and it concluded that the petitioner had not established his allegations by clear and convincing evidence. We again agree with the Court of Criminal Appeals that the evidence in the record does not preponderate against the trial court's factual findings and that the petitioner failed to establish that trial counsel were deficient.

As with the Karen Pulley case, trial counsel's investigation and defense were reasonably shaped by Nichols' confessions and statements to the non-capital offenses. Nichols confessed to the offenses involving T.R., S.T., P.G., and P.R. His confession to the rape of P.R. described his entry into the victim's home with a screwdriver, the location of the victim, the clothing he tore from the victim, and the circumstances of the offense. His confession to the rape of P.G. described his entry, use of a knife, the location of the victim on a couch in the living room, and the facts of the offense.

Although the petitioner now argues that his trial counsel failed to investigate evidence of his innocence and failed to challenge his confessions as false because they were given in a short period of time in response to leading questions asked by police officers, we once again observe that he never refuted his confessions or his statements to his trial counsel and never provided a basis for a false confession defense. In addition, the record reveals that substantial evidence corroborated trial counsel's testimony. By entering guilty pleas for the offenses against S.T., for example, the petitioner acknowledged the evidence of his guilt, which included S.T.'s identification of him from a photograph and the finding of a pistol belonging to S.T. in his car. In entering guilty pleas for the offenses against T.R., the petitioner conceded the evidence of his guilt and knowingly and voluntarily waived his right to a jury trial. Finally, in the trials for the offenses against P.G. and P.R., the victims made in-court identifications of the petitioner as the assailant, and the juries found that the petitioner's guilt was proven beyond a reasonable doubt.

In sum, the evidence at the post-conviction hearings did not establish the deficient performance of counsel given the petitioner's confessions and consistent statements of guilt. We conclude that trial counsel's representation did not fall below an objective standard of reasonableness either in failing to investigate any evidence of innocence or in failing to challenge the confessions as false.

In addition, we agree with the Court of Criminal Appeals' conclusion that Nichols failed to show any prejudice under the second prong of the analysis. As we have discussed, the record reveals that Nichols confessed to the offenses against T.R. and S.T. and that he knowingly and voluntarily entered pleas of guilty to the offenses. In light of his confessions and consistent statements of guilt, as well as trial counsel's testimony that the petitioner was fully aware of the defense strategy and all of his options, it would be speculation to find from any of the evidence introduced at post-conviction that he would have proceeded to trial instead of pleading guilty. See Hill v. Lockhart, 474 U.S. at 59, 106 S. Ct at 370. Similarly, the petitioner's confessions to the offenses committed against P.G. and P.R. were read to the jury in the trials for those offenses, and the victims identified him as the

perpetrator. The evidence at post-conviction with respect to P.G. and P.R. therefore failed to establish a reasonable probability of a different outcome but for the performance of counsel.

## II. Ineffective Assistance of Counsel – Unlawful Arrest

The petitioner argues that his trial counsel were ineffective for failing to seek suppression of his statements on the basis that he was arrested without a warrant and without probable cause on January 5, 1989. Nichols asserts that police notes indicate that it was not until after his arrest that at least three of the victims identified him from a photograph taken by police on January 6, 1989, and that the statements he made during the period of alleged illegal detention should have been suppressed. The State maintains that the police verified the anonymous tip by discovering evidence of Nichols' prior arrest for a sex crime and that an arrest was made after at least one of the victims identified Nichols from his mug shot.

The trial court reviewed the evidence in the record and the testimony of trial counsel, who recalled that they vigorously sought suppression of Nichols' statements on numerous grounds. Although the trial court determined that counsel "should have more fully pursued this issue," it found that

> [v]iewing the exhibits and records as a whole, it appears that some of the photo identifications occurred after the petitioner's arrest. This fact, however, does not establish that none of the identifications occurred before his arrest. Numerous documents and/or statements refer to some pre-arrest identifications. . . . No victims were called to ask at what point they had made these identifications. Although petitioner has pointed out the ambiguities, . . . he has failed to establish the lack of any pre-arrest identifications and thus has failed to establish any prejudice. . . .

We agree with the Court of Criminal Appeals' conclusion that the record does not preponderate against the trial court's factual findings inasmuch as there is evidence in the record indicating that Nichols had been identified before his arrest. An offense report dated January 6, 1989 and prepared by the East Ridge Police Department states that officers received an anonymous tip on January 5, 1989, which led to a computer check and discovery of Nichols' prior arrest for a sex offense. The report indicates that a victim identified Nichols as the perpetrator from his mug shot and that "she was the fourth victim in a row" to identify Nichols. In addition, the record reveals that at the trial of P.R., Captain Holland of the East Ridge Police Department testified that the victim identified Nichols prior to his arrest on January 5, 1989. As both the trial court and Court of Criminal Appeals observed, none of the victims were called to testify in post-conviction as to when they made an identification of Nichols. Accordingly, we conclude that the evidence in the record does not preponderate against the trial court's factual findings on this claim and that the petitioner has failed to establish that his trial counsel were deficient on this ground.

-18-

In a similar vein, Nichols argues that counsel were ineffective for failing to seek suppression of his statements on the basis that he was not taken before a judicial officer within 72 hours of his arrest. The trial court specifically rejected the basis for this claim:

> Although no paperwork on the arraignment was introduced, there was evidence of an arraignment. In the transcript of the motion to suppress, the petitioner himself referred numerous times to the fact that he was arraigned the day after he was arrested. . . . In addition, [the assistant district attorney's] notes refer to an arraignment before a special judge as well. Under these circumstances, petitioner has not established that he was not arraigned, that counsel was ineffective or that he was in any way prejudiced by counsel's failure to challenge the timing of the arraignment.

We agree with the Court of Criminal Appeals' conclusion that the evidence in the record does not preponderate against the trial court's factual findings on this issue. We also agree that the petitioner failed to show that suppression would not have been required given that Nichols was read his Miranda rights, that he confessed within 24 hours of his arrest, and that there appeared to be no intervening circumstances or misconduct in regard to obtaining the confessions. See State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996). In sum, we conclude that the petitioner failed to establish that he was denied the effective assistance of counsel on this basis.

### III.  Ineffective Assistance of Counsel – Mitigating Evidence

#### A.  Standards in Capital Sentencing

The Eighth and Fourteenth Amendments to the United States Constitution mandate that a death sentence be based on a "particularized consideration of relevant aspects of the character and record of each . . . defendant." Woodson v. North Carolina, 428 U.S. 280, 303, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944 (1976). As a result, courts are "particularly cautious in preserving a defendant's right to counsel at a capital sentencing hearing." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (quoting Deutscher v. Whitley, 884 F.2d 1152, 1160 (9th Cir. 1989)). Although there is no requirement that defense counsel present mitigating evidence in the penalty phase of a capital trial, counsel's duty to investigate and prepare for a capital trial encompasses both the guilt and sentencing phases. Goad v. State, 938 S.W.3d at 369-70; State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989).

When a petitioner challenges a death sentence based on ineffective assistance of counsel in the penalty phase, he or she must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S.Ct. at 2069. Where the alleged prejudice involves counsel's failure to present sufficient mitigating evidence, several factors are of significance:  (1) the nature and extent of the mitigating evidence that was available but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of

aggravating factors that the mitigating evidence would not have affected the jury's determination. Goad v. State, 938 S.W.2d at 371.

## B. Petitioner's Allegations

The petitioner argues that his counsel were ineffective during the sentencing phase of the capital proceeding for the rape and murder of Karen Pulley for failing to present sufficient evidence of mitigating circumstances. The State maintains that the trial court properly denied relief on this claim after finding that the mitigating evidence now cited by the petitioner would have duplicated or been cumulative to that introduced by trial counsel. We will review the evidence introduced by Nichols at the post-conviction hearings.

Deborah Nichols Sullivan, the petitioner's sister, who testified by deposition, said that she loved her brother and tried to take care of him after their mother died of cancer. She described Nichols as quiet, with a mild demeanor, and recalled that he held his mother's hand while she was ill. She testified that she was afraid of her father's intense spankings, which often left welts and stripes. She was "sure" Nichols received such spankings as well. She would not confirm that she was sexually abused but did say "that would be me and not [the petitioner]." When they were placed in the children's home, she was told it was because her father could not care for them.

Deborah Nichols acknowledged that trial counsel probably tried to contact her but that she did not return their calls. Indeed, counsel Rosemary Bryan testified that she spoke to the witness two or three times and that they hoped she would testify about the family background, their abusive father, and the orphanage. Counsel said, however, that Deborah Nichols "was the most unwilling witness that you would ever want to put on the stand." The witness told counsel, for example, that she would not talk about any abuse in the family and had nothing to say that would help her brother. Moreover, her husband said that she would not testify under any circumstances. Finally, counsel said that Nichols decided he did not want to make his sister testify under the circumstances.

Several other witnesses testified as to their experiences with Nichols, as well as with Nichols' family. Diana Allred testified that she and her brother lived with the Nichols' family from 1961 to 1967 following the death of their parents. She said that Nichols' father would get angry and "spank" Nichols and his sister, Deborah, and that she saw Deborah bleeding after the spankings. Allred testified that Nichols' father often undressed in front of her and once asked if he could get in bed with her. She said that although Nichols seemed like a "normal" child when she lived there, he and his sister seemed frightened and shy years later after Allred had moved out.

Royce Sampley, Diana Allred's brother, testified that the Nichols' home was a "threatening" place in that Nichols' father was often angry and cursing. Sampley testified that he never saw any sexual abuse of Nichols. Neither Allred nor Sampley had any contact with Nichols after 1971 and were not aware of the charges against Nichols at the time of the trial and sentencing. Dennis Sampley, brother of Royce Sampley and Diana Allred, testified that he was not familiar with Nichols but that he had lived in the same children's home. He testified that he received whippings in the

home, as did other children, and was not permitted to tell anyone. He described it as a "hellacious home."

Juanita Herron, a cousin, said that Nichols became "disturbed" and "sad" following his mother's death. She testified that Nichols' sister had reported sexual abuse and that family members arranged to have the children placed in a children's home. Louella Wagner, also a cousin, testified that Nichols' father was strict. Margaret Crox and Linda Crox Johnson, who had been neighbors of the Nichols, said that the petitioner's father did not seem concerned about his children.

Jim Gumm testified that he went to school with Nichols until they were both sophomores in high school and that he always considered Nichols to be "one of the nicest guys around." Nancy Atchley, who taught Nichols in the seventh and eight grades, testified that he had been a sweet, kind, and well-mannered student who was quieter than the other boys. Jacqueline Boruff, whose son was a friend of Nichols when they were teenagers, said that Nichols was "sweet" and that his father was an "ass" who was cold and uncaring. Like several of the post-conviction witnesses, Boruff said that she was not contacted before the capital sentencing proceeding.

Several witnesses testified regarding the children's home in which Nichols and his sister had been placed after their mother's death. Claude Nichols, the petitioner's uncle, testified that the petitioner's father said the children had been placed in a group home through a decision of the church. Winston Gonia, who had testified during the capital sentencing, testified that he had been a board member of the Tomlinson Children's Home; the group home was a disciplined place but he never saw any abuse take place there. Jackie Bailey, an academic and personal counselor at the Tomlinson Children's Home from 1974 to 1977, testified that she counseled Deborah Nichols but had no information about the petitioner or his background.

Linda Melton, a former house parent at the Tomlinson Children's Home, testified that the petitioner and his sister were close. She said that the 15-year-old Nichols never caused any problems and was a "sweetheart." Melton testified that the children's activities were church-related and that paddling was not used as a means of discipline.[7] Arlyne McGriff testified by deposition that she was a house parent at the home just before it closed; she recalled that Nichols talked about his mother and did not cause any problems. She testified that Nichols' father visited two or three times while she was the house parent. Neither Melton nor McGriff were contacted by trial counsel.

Finally, Nichols presented testimony from three expert witnesses. Dr. Kenneth Nickerson, a clinical psychologist, evaluated Nichols in April and May of 1989. He testified that he interviewed Nichols and reviewed notes taken by Dr. Frausto Natal, a psychiatrist who had conducted an interview and examination. Dr. Natal's notes indicated that Nichols denied murdering any of the

---

[7] However, Pamela Taylor, a part-time investigator, testified that she visited the children's home, conducted interviews, and gathered information about its operation. She learned that the home's policy was to keep children separate from those outside the church and that the home had guidelines as to how corporal punishment with a paddle was to be carried out.

victims. Dr. Nickerson testified that Nichols had not shown any prior signs of "intense or explosive emotions," that he was found competent to stand trial, and that he was not legally insane at the time of the offenses.

Dr. David Solovay, a clinical psychologist, testified that he reviewed the case notes, examination, assessment, reports, and testimony of Dr. Eric Engum, who had testified on Nichols' behalf in the sentencing proceeding. Dr. Solovay said that Dr. Engum did a "fine job" and that Engum's notes and data were similar to his own. He criticized Dr. Engum for failing to identify himself as a member of the defense team, however, and for failing to present the petitioner's background as a mitigating factor. Dr. Solovay did not agree with the diagnosis of intermittent explosive disorder, but instead diagnosed Nichols as having borderline personality disorder. Dr. Solovay said that Nichols had learned to "disassociate" from threatening situations. He admitted that his report revealed that Nichols had acknowledged his guilt to him and had shown remorse.

Dr. Frank Einstein testified that he is a mitigation specialist who works with defense attorneys in capital defense representation. He described that mitigation work involves examining a defendant's life, identifying life events that led up to the offense, and presenting the complete story of the defendant's life for the jury's consideration. Dr. Einstein testified that significant events in this case included Nichols' inability to remember events before the age of ten, the presence of Nichols' cousins in his home, the death of his mother and grandmother, the physical and emotional abuse in the home, and his being placed in an orphanage.

Dr. Einstein said that Dr. Engum and investigator Michael Cohan identified the major events in Nichols' life. He believed that trial counsel should have presented additional information to humanize Nichols and to illustrate the conduct of Nichols' father, the presence of physical and sexual abuse in the home, and the isolation of the family. Dr. Einstein said that although trial counsel identified many of these themes, they did not present the evidence in such a way to establish a link between Nichols' background and the crimes. He admitted that some mitigation themes can have a negative effect and that it is difficult to second-guess counsel.

C. Findings and Conclusions

The trial court, after considering the testimony of all of these witnesses during the post-conviction hearings and reviewing the record, made extensive findings of fact, including:

> Petitioner presented numerous relatives and acquaintances at the hearings in this matter to demonstrate the amount and type of mitigating evidence which was not presented at the sentencing hearing at the original trial. . . . Many of these witnesses, however, were cumulative and only expounded on issues which were raised through the evidence presented by trial counsel at the sentencing hearing. . . . The psychologist retained by post-conviction counsel even testified that while he may have had more personal history in

-22-

conducting his evaluation, it was essentially the same kind of information Dr. Engum and trial counsel had at the original trial.

The trial court further concluded:

> Many of the witnesses testified that they were not contacted and that the petitioner probably did not know how to contact them. Some witnesses, however, testified that the petitioner knew how to contact them but that they received no contact and did not step forward on their own. Using 20-20 hindsight more witnesses may have been preferable; based upon all the evidence and documentation, however, this court finds that counsel [were] not derelict in their investigation of this case and that no prejudice has been shown. . . . Any additional witnesses would have been cumulative or the weight of their testimony would have been minimal. The aggravator of prior violent felonies was very substantial.

We agree with the Court of Criminal Appeals that the evidence in the record supported the trial court's findings and conclusions.

In applying the first part of the analysis in Goad v. State, 938 S.W.2d at 371, the trial court correctly noted that the nature and the extent of the evidence at post-conviction focused on the petitioner's family background, abusive father, placement in a children's home, and pleasant personality as a child. Although witnesses described the petitioner's father as angry and abusive, Nichols himself never testified regarding any possible abuse he suffered at home or in the children's home. Only one witness, Deborah Nichols, said that she saw her father abuse the petitioner; however, she made herself unavailable to trial counsel and refused to testify. Several witnesses testified that Nichols was a pleasant child who was quiet and well-mannered. Although one witness claimed that abuse took place in the children's home, there was no evidence that Nichols was ever abused there; indeed, several other witnesses testified that the orphanage was not an abusive environment. Finally, there was expert testimony questioning whether Nichols suffered from an explosive disorder, as diagnosed by Dr. Engum, and questioning the manner in which trial counsel presented the mitigating themes and evidence at the sentencing.

In applying the second Goad factor, the trial court correctly found that the evidence was cumulative to that presented by trial counsel at sentencing. Three witnesses at sentencing had testified about Nichols' background and placement in an orphanage. Several witnesses said they had known Nichols to have been a "fine young man" and to have possessed good character as a child and as an adult. Several witnesses, including Nichols, testified about his troubled relationship with his father and the abandonment associated with being placed in an orphanage. Nichols denied, however, that he was ever physically abused by his father or at the orphanage. Finally, there was expert testimony regarding Nichols' intermittent explosive disorder and how it affected his conduct. Accordingly, the record indicates that trial counsel identified and supported the relevant mitigating

themes. The evidence presented at post-conviction did not contest trial counsel's performance in this regard, but rather, second-guessed the quantity of the mitigating evidence and the manner of its presentation.

Finally, with respect to the third and final Goad factor, it appears that any of the evidence at post-conviction which was not cumulative or may have bolstered the evidence presented at trial would not have affected the jury's determination given the strong evidence supporting the prior violent felonies aggravating circumstance. In sum, Nichols has not established a reasonable probability that the jury would have concluded that the "balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S.Ct. at 2069; see also Goad v. State, 938 S.W.3d at 371.

## IV. Ineffective Assistance of Counsel – Prosecutorial Misconduct

The petitioner next argues that his trial counsel were ineffective for failing to object to the prosecution's misconduct in eliciting the facts of the rape offenses used to prove the prior violent felony aggravating circumstance during the sentencing phase of his capital trial. The State maintains that counsel were not ineffective because there was no misconduct by the prosecution.

The record reveals that in its cross-examination of Nichols, the prosecution asked about the rapes he committed against T.R., S.T., P.G., and P.R. In particular, the prosecutor asked whether Nichols had committed a rape on December 21, 1988, by using a knife; whether Nichols had committed a rape on December 27, 1988, by using an electrical cord; and whether Nichols had committed a rape against two victims on January 3, 1989, one of which involved the use of a knife. Nichols admitted that he committed all of the offenses.

In State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994), the prosecutor introduced the facts of a prior murder conviction it relied upon as an aggravating circumstance and strongly implied in closing argument that the jury should return a death sentence based on the facts of the prior murder conviction for which the defendant had only received a life sentence. Indeed, the prosecutor's argument contained extensive references to the facts of the prior murder, the victim of the prior murder, the family of the victim of the prior murder, and the need to impose the death penalty because of the prior murder. Id. at 810. We concluded that the introduction of such evidence is error where the prior conviction on its face involves violence or the threat of violence, and we held that the prosecutor's argument, which improperly enhanced the impact of the aggravating circumstance, affected the jury's determination to the prejudice of the defendant. Id. at 811-12.

In applying Bigbee, we have focused upon the nature and extent of the evidence introduced, the prosecutor's intent, and whether the evidence or argument improperly enhanced the aggravating circumstance or affected the jury's verdict to the prejudice of the defendant. See State v. Stout, 46 S.W.3d 689, 701 (Tenn. 2001); State v. Chalmers, 28 S.W.3d 913, 918 (Tenn. 2000). We have, in effect, clarified that Bigbee involved serious prosecutorial misconduct and that not every violation of the Bigbee holding warrants reversible error and a re-sentencing.

Accordingly, our review of the record reveals that trial counsel did not render ineffective assistance of counsel by failing to object to the prosecutor's questioning. First, we note that Bigbee had not been decided at the time of the sentencing in this case; thus, counsel cannot be considered deficient for failing to object to a violation of its holding. Second, the record indicates that the facts of the underlying rapes were briefly cited by the prosecutor and admitted by Nichols without a lengthy discussion or detailed description of the rapes. Finally, the prosecution did not enhance the aggravating circumstance by unduly or repeatedly emphasizing the underlying facts of the prior convictions, nor did it imply that the jury should impose the death penalty based on the facts of the prior convictions in such a manner that affected the verdict to the prejudice of the petitioner.[8] Accordingly, we conclude that trial counsel were not deficient in failing to object to the prosecutor's conduct and that there was no reasonable probability of a different outcome even had counsel objected.

## V.  Ineffective Assistance of Counsel –  Jury Instructions

The petitioner argues that his counsel were ineffective for failing to request that the trial court charge the jury with regard to the definition of mitigation, the weight to be given mitigating evidence, the mitigating circumstances in Tennessee Code Annotated § 39-13-204(j)(7) and (8), and several non-statutory mitigating circumstances. As the State asserts, each of the issues is without merit.

First, this Court has held that a jury instruction on the definition of mitigation or the weight to be given mitigating circumstances is not required. See State v. Brimmer, 876 S.W.2d 75, 83 (Tenn. 1993). Next, the record did not support an instruction on the mitigating circumstance in Tennessee Code Annotated § 39-13-204(j)(7), i.e., the youthfulness of the defendant, given that Nichols was a 28-year-old high school graduate with an honorable discharge from the military. Third, contrary to the petitioner's contention, the trial court did charge the jury on the mitigating circumstance in Tennessee Code Annotated § 39-13-204(j)(8), i.e., that the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of a mental disease or defect that substantially affected his judgment. Finally, we have held that the trial court was not required to charge the jury on specific, non-statutory mitigating circumstances at the time of this offense and trial. See State v. Cauthern, 967 S.W.2d 726, 747 (Tenn. 1998). Accordingly, trial counsel were not deficient for failing to request these instructions.

---

[8] We note that both the Court of Criminal Appeals and the State rely upon Tennessee Code Annotated § 39-13-204(c), which presently states in part: "In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction." Neither the intermediate court nor the State acknowledge that this statute was not in effect until 1998, well after the offenses and trial in this case, nor do they otherwise cite reasons for applying the statute in this case.

In a related issue, Nichols argues that trial counsel were deficient for failing to object to the trial court's instruction that "the verdict must be unanimous" because it misled the jury to believe that unanimity was required to return a life sentence. As the State observes, this Court has rejected arguments contesting the unanimous verdict instruction. See State v. Nesbit, 978 S.W.2d 872, 902-903 (Tenn. 1998); State v. Brimmer, 876 S.W.2d at 87.

## VI.   Ineffective Assistance of Counsel –  Constitutional Issues

The petitioner argues that trial counsel were ineffective for failing to challenge the constitutionality of the death penalty on the basis that it cannot be administered fairly and cites the dissenting opinion in Callins v. Collins, 510 U.S. 1141, 1143, 114 S. Ct. 1127, 1128, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting). This Court has repeatedly upheld the constitutionality of the death penalty in this State. See Terry v. State, 46 S.W.3d 147, 169 (Tenn. 2001); State v. Stout, 46 S.W.3d at 719; State v. Hall, 976 S.W.2d 121, 166 (Tenn. 1998).

Nichols also argues that trial counsel were ineffective for failing to challenge the constitutionality of the death penalty on the basis that it violates the fundamental right to life without serving any compelling state interest. This Court has rejected such a claim. State v. Mann, 959 S.W.2d 503, 536 (Tenn. 1998); State v. Bush, 942 S.W.2d 489, 523 (Tenn. 1997).

## VII.   Ineffective Assistance of Counsel –  Psychologist's Notes

The petitioner argues that his trial counsel were ineffective for failing to argue that the trial court's order requiring the defense to disclose the notes of Dr. Eric Engum at trial violated his right against self-incrimination under the United States and Tennessee Constitutions. The State contends that trial counsel were not ineffective because the disclosure of the notes for the purpose of impeachment or rebuttal did not violate the petitioner's right against self-incrimination.

The record reveals that the trial court's order stemmed from the defense's failure to prepare a final report of Dr. Engum's findings until the second day of trial. On direct appeal, we held that the notes were discoverable under the circumstances of the case pursuant to the discovery provisions of Tenn. R. App. P. 16(b)(1)(B):

> We thus conclude that when a psychologist or psychiatrist does not prepare a summary report, but instead relies on extensive memoranda to record not only observations and hypotheses but also evaluations, such records are discoverable. . . . Although we do not suggest that the trial court should require a formal report in every case, we do conclude, under the facts of this cases, that Rule 16 authorized discovery of the available reports to the extent that they related to the testimony to be given at trial.

State v. Nichols, 877 S.W.2d at 730.

The petitioner now argues that his counsel were ineffective for failing to argue that the disclosure violated his constitutional right against self-incrimination and that the error was prejudicial because the prosecution used the notes to impeach the testimony of Dr. Engum by charging that he was a member of the defense team attempting to help Nichols avoid the death penalty. Although Moore and Bryan admitted at the post-conviction hearing that the disclosure and the prosecution's cross-examination of Dr. Engum was damaging to the defense, they did not believe it affected the jury's verdict.

As the State notes, this Court has indicated that where a defendant initiates a psychiatric examination and introduces evidence from the examination, his right against self-incrimination is not violated by disclosure of the information or the prosecution's use of the information for impeachment and rebuttal. See State v. Martin, 950 S.W.2d 20, 24 (Tenn. 1997). The same principles apply to the sentencing proceeding of a capital trial. State v. Reid, 981 S.W.2d 166, 172-73 (Tenn. 2001).

Moreover, although as the trial court noted, "hindsight may indicate that the failure to prepare a final report may have been imprudent," it is clear that the issue did not affect the jury's verdict. The prosecution would have been entitled to a final report that would not have violated the petitioner's right against self-incrimination; indeed, on direct appeal, we said that the notes were tantamount to a report under the facts of this case. Dr. Engum testified that he evaluated Nichols and interviewed several background witnesses and that he ultimately determined that Nichols had an intermittent explosive disorder. The prosecution's cross-examination attempted to impeach Dr. Engum's testimony by charging that Engum was a member of the defense team and by showing that Nichols acted with deliberation and in his own self interest. In sum, when the evidence is viewed along with the petitioner's confession and the overwhelming weight of the aggravating circumstance, it is clear that the petitioner has failed to show a reasonable probability of a different outcome but for counsel's failure to argue that the disclosure of the notes violated his right against self-incrimination.

## VIII. Remand for Additional DNA Testing

The petitioner argues that the Court of Criminal Appeals erred in refusing to remand the case to the trial court for additional DNA testing to establish his innocence.[9] The State maintains that the issue of additional DNA testing was not properly raised by the petitioner and was correctly denied.

The record indicates that the post-conviction trial court authorized DNA testing of evidence taken from the rape kit performed on Karen Pulley. After finding that "[n]o results which would establish any prejudice to the petitioner . . . were submitted to the court at the final hearing," the trial

---

[9] DNA analysis "means the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes." Tenn. Code Ann. § 40-30-402.

court denied the petitioner's request for additional DNA testing. The petitioner did not challenge the trial court's denial of additional DNA testing as an issue on appeal.

Following the Court of Criminal Appeals' decision and its denial of a petition to rehear, Nichols filed a motion for consideration of post-judgment facts[10] requesting that the case be remanded for additional DNA testing. The motion asserted that the Court of Criminal Appeals' rejection of the serology evidence concerning Karen Pulley in effect meant that the court was requiring the petitioner to show actual innocence to establish the prejudice component of his ineffective assistance of counsel claim, and that additional DNA testing was required to meet such an "unreasonable" standard. The motion was accompanied by the records and documents regarding Nichols' initial request for DNA analysis, which had been granted by the trial court, and his motion for additional DNA testing, which had been denied. The petitioner asked that the record be supplemented and asserted that due process required consideration of this issue because his liberty interests outweigh any interest the State may have in finality of the judgments.

The Court of Criminal Appeals denied the motion for two reasons. First, the court stated that it had not required actual innocence to establish the prejudice prong of the ineffective assistance of counsel claim; instead, it applied the analysis of whether the petitioner had shown a reasonable probability of a different outcome. Second, the court found that the motion was not based on post-judgment facts as required by Tenn. R. App. P. 14. The court concluded:

> Seeking to utilize the doorway made available by [Rule 14] for consideration of 'facts concerning the action that occurred after judgment,' the petitioner asks by the motion to have this court consider arguments and supporting documents as 'facts' and rule *ex parte* on a matter which was not raised previously in his appeal. . . . The petitioner has recast the arguments raised in his previous petition to rehear, that this court erred in its treatment of the serology evidence presented and in its application of the standard for determining whether counsel was ineffective, and now presents them as the basis of his motion to consider post-judgment facts.

Our review of the record reveals that the Court of Criminal Appeals correctly denied the motion for consideration of post-judgment facts and the request to remand the case for additional DNA testing. The petitioner misconstrues the appellate court's analysis of the ineffective assistance claim – the court concluded that Nichols failed to show that his trial counsel were deficient inasmuch as he repeatedly admitted that he committed the offenses and the serology evidence did not exclude

_____

[10] An appellate court "on its own motion or on motion of a party may consider facts concerning the action that occurred after judgment. Consideration of such facts lies in the discretion of the appellate court. While neither controlling nor fully measuring the court's discretion, consideration generally will extend only to those facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters." Tenn. R. App. P. 14.

him as the assailant. When the court also considered the prejudice component, it properly analyzed whether the petitioner showed a reasonable probability of a different outcome.

In any event, the motion for consideration of post-judgment facts was improper given that it did not contain post-judgment facts but rather reasserted matters that had been denied by the trial court and were not appealed at all by the petitioner. In addition, as the State recognizes, relief based on DNA analysis may be sought upon making the required showing pursuant to the appropriate procedure. See Tenn. Code Ann. § 40-30-401 ("Post-Conviction DNA Analysis Act of 2001"). In sum, the Court of Criminal Appeals did not abuse its discretion in denying relief.

### IX. Right Against Self-Incrimination

As summarized earlier, Nichols did not testify in support of his post-conviction allegations. Moreover, when called to the stand by the prosecution, the petitioner invoked his right against self-incrimination and refused to answer questions about the offenses or the post-conviction allegations.

Although the State did not appeal the issue, the Court of Criminal Appeals held that the trial court's decision to allow the petitioner to invoke his right against self-incrimination was erroneous. The intermediate court reasoned that there is no right against self-incrimination in a post-conviction case under the Fifth Amendment to the United States Constitution or article I, § 8 and 9 of the Tennessee Constitution because the petitioner had already been convicted of the offenses being challenged. The court also stated that a reviewing court may draw a negative inference from a petitioner's failure to testify in support of the post-conviction allegations.

Nichols initially argued that the Court of Criminal Appeals erred in addressing this issue because it had not been appealed by the State and was not properly before the court for review. Nichols has additionally argued that there is a right against self-incrimination in a capital post-conviction procedure due to the likelihood that a capital conviction or sentence may be reversed and remanded for new proceedings. In sum, Nichols argues that a petitioner should not be forced to make statements in a post-conviction hearing because the statements may be used in later proceedings if the petitioner is successful in obtaining post-conviction relief. The State argues that the Court of Appeals erred in addressing this issue because it was not raised on appeal and that the court's decision amounts to an improper advisory opinion.

Although we ordered the parties to file additional briefs on this issue, we now agree with the parties that the intermediate court erred in addressing this issue. See Tenn. R. App. P. 13(b) ("Review will generally extend only to those issues presented for review"). Nichols was permitted to assert his right against self-incrimination by the trial court and did not answer any of the questions asked by the prosecutor about the offenses or the post-conviction allegations. The State opted not to appeal the trial court's ruling in this respect.

Although the petitioner was not prevented from asserting a right against self-incrimination, he argues on this appeal that he was harmed because the intermediate court drew a negative inference

from his failure to testify as it considered each issue on appeal. It is not clear from the court's language, however, whether it did in fact draw such an inference or whether it was simply observing that a court may choose to do so. ("[W]e conclude that an adverse inference could have been drawn because of the petitioner's refusal to answer questions of the State."). In either case, this Court has drawn no inference from the failure to testify, and it has not affected our conclusions that the evidence supports the trial court's findings and that the petitioner has not shown he is entitled to relief. Accordingly, our review of whether a right against self-incrimination applies in post-conviction cases under the facts and circumstances of this case would amount to an advisory opinion. We therefore hold that the Court of Criminal Appeals erred in addressing this issue, but that the error has not affected the result.

## X. Trial Court's Findings and Cumulative Error

The petitioner argues that the trial court's findings were clearly erroneous and that the cumulative effect of all the errors in the record amounted to reversible error. Our review of all of the above issues necessarily reveals that these two contentions are without merit.

## CONCLUSION

After reviewing the record and applicable authority, we conclude: (1) that the petitioner was not denied his right to the effective assistance of counsel based on the failure to investigate and challenge his confessions as false; (2) that the petitioner was not denied his right to the effective assistance of counsel based on the failure to challenge the legality of his arrest; (3) that the petitioner was not denied his right to the effective assistance of counsel at the sentencing phase of his capital trial based on the failure to present additional mitigating evidence; (4) that the petitioner was not denied his right to the effective assistance of counsel at the sentencing phase of his capital trial based on the failure to object to misconduct by the prosecution; (5) that the petitioner was not denied his right to the effective assistance of counsel at the sentencing phase of his capital trial based on the failure to request mitigating instructions; (6) that the petitioner was not denied his right to the effective assistance of counsel at the sentencing phase of his capital trial based on the failure to raise issues regarding the constitutionality of capital punishment; (7) that the petitioner was not denied his right to the effective assistance of counsel at the sentencing phase of his capital trial based on the failure to object to the discovery of notes prepared by a defense psychologist on self-incrimination grounds; (8) that the Court of Criminal Appeals did not err in refusing to remand the case for additional DNA testing; (9) that the Court of Criminal Appeals erred by addressing the issue of whether the petitioner had a right against self-incrimination in this post-conviction proceeding, but the error had no effect on the outcome; and (10) that the trial court's findings were not clearly erroneous and cumulative error did not require the reversal of the petitioner's convictions.

Accordingly, we affirm the Court of Criminal Appeals' judgment. It appearing that the petitioner is indigent, costs are taxed to the State of Tennessee.

_____
E. RILEY ANDERSON, JUSTICE