IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 3, 2002

## GABRIEL BRYAN BAGGETT v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-A-457      Steve R. Dozier, Judge**

_____

**No. M2002-00591-CCA-R3-PC - Filed March 20, 2003**

_____

The petitioner, Gabriel Bryan Baggett, pled guilty to second degree murder and especially aggravated robbery, receiving sentences of fifty years and twenty-five years, respectively, at 100%. He filed a petition for post-conviction relief, alleging ineffective assistance of counsel and that his pleas of guilty were involuntary. Following a hearing, the post-conviction court dismissed the petition, and this appeal followed. We affirm the order of the post-conviction court dismissing the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Michael A. Colavecchio, Nashville, Tennessee, for the appellant, Gabriel Bryan Baggett.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Pamela S. Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Because a portion of the petitioner's complaints is based upon his pleas of guilty, we first will review the proceeding at which the pleas were entered.

The petition to enter pleas of guilty provides, as to the murder charge, that the charge was "reduced to 2nd degree murder, 50 years at 100% (85% eligibility), defendant waives range," and, as to the robbery charge, "especially aggravated robbery – 25 years at 100% (85% eligibility), concurrent to count 1."

At the guilty plea submission hearing, the court questioned the petitioner about the sentences to be imposed, following the announcement by the State as to the agreement:

[THE STATE]: Your Honor, the State would recommend as to Count I of the indictment, that the defendant enter a plea to the offense of second degree murder. The State would further recommend that the defendant, by agreement, plead out of range to second degree murder and receive a sentence of fifty years at one hundred percent. He would otherwise be a standard offender.

The State would further recommend as to Count II of the indictment, that the defendant receive a sentence of twenty-five years at one hundred percent to the offense of especially aggravated robbery. And that that conviction would run concurrently with [the] second degree murder conviction.

. . . .

THE COURT: All right. It's being recommended, Mr. Baggett, on your plea of guilty to a reduced charge of second degree murder against the victim . . . in Count I, that you receive a fifty year sentence to serve with the Department of Corrections at one hundred percent. Is that your understanding?

DEFENDANT BAGGETT: Yes, sir.

THE COURT: All right. It's being recommended in Count II on your plea of guilty to especially aggravated robbery that you receive a twenty-five year sentence at one hundred percent to run concurrent or together with Count I for an effective fifty year sentence at one hundred percent. Is that your understanding?

DEFENDANT BAGGETT: Yes, sir.

. . . .

THE COURT: All right. Do you understand, Mr. Baggett, that the sentences are at one hundred percent? You've put in this plea petition that – and the statute allows a reduction to eighty-five percent, but that is up to the parole board. In other words, this sentence is being composed at one hundred percent, one hundred percent of this fifty year sentence you are subject to serving. Do you understand that?

DEFENDANT BAGGETT: Yes, sir.

At the post-conviction hearing, the petitioner explained his complaints. He testified that he had not understood that his sentences were to be served at 100%:

> Q    Okay.    And what, to your understanding, was [sic] the conditions of that guilty plea?
>
> A    My understanding was that I was to enter a guilty plea of second degree murder and especially aggravated robbery, fifty years at eighty-five percent with the twenty-five to run concurrent with the fifty.
>
> Q    All right. Now, you said on the murder, fifty years at eighty-five percent.
>
> A    Yes, sir.
>
> Q    During the plea, Judge Dozier asked you if you understood that this was a one hundred percent plea, not an eighty-five percent. Do you remember that?
>
> A    I remember him asking me if I was entering a plea and everything. Everything was just happening so quick I was just like, yeah, yeah, yeah. I was just trying to get out of Court, right.
>
> Q    Okay. Now, at what point in time had you – before the plea, had you heard the terms, eighty-five and a hundred percent? When had you heard those?
>
> A    Upstairs that morning when I was talking with my lawyers . . . . They were telling me that if I entered the plea, it would be at eighty-five percent. And that's why I consented to it. That's why I signed the papers on. That's – they say, here's the papers, it's at eighty-five percent, sign it, we'll go downstairs and it will be official.
>
> Q    Now, if the plea agreement, though, shows that you signed one saying a hundred percent and if you agreed in Court to accept a hundred percent, how do [you] explain that to the Court?
>
> A    I'm confused, man, you know, everything was happening real quick.
>
> Q    What led you to believe it was eighty-five?

A    These lawyers kept telling me it's at eighty-five, it's eighty-five. Both of them were telling me that.

He complained also in his post-conviction petition that trial counsel had not shown him the evidence against him, and was questioned at the hearing about this assertion:

Q    Now, let's talk more about before the plea agreement. Let's talk about the evidence in your case.

A    What evidence?

Q    What – what evidence did you see?

A    That's why I'm asking you, what evidence. I've never seen anything besides my indictments. You know –

Q    Did they ever show – didn't they show you the discovery?

A    No, I never seen my discovery. All I had was the copy of my indictments.

Q    Didn't they show – didn't they show you – or didn't they explain to [you] then, if they didn't show it to you, what proof the State would bring to show to a Jury during a Jury trial?

A    Not that I remember.

Q    So it's your contention that they never showed you or told you what the Jury would see in a Jury trial?

A    I never seen anything.

Q    Okay. Did you feel like you were very involved in your defense?

A    No, not really. Because, you know, I only seen them about four or five times the whole entire time I was up at CJC.

The petitioner testified that his trial counsel had explained that he could file a post-conviction petition within a year and that he would receive a trial:

A    Basically, he said, if I go on and enter this plea of guilty, I could go on and file this post conviction as long as I did it within a year.

Q    Okay. What did you know about the term, post conviction, before [trial counsel] mentioned it to you?

A    I never heard of it.

Q    Okay. Did he explain anything more about what post conviction was?

A    He told me it'd be like I'm suing him to get a new trial.

Q    Okay.

A    That was basically it.

Q    And so that led you to believe that if you . . . filed a post conviction motion within one year of accepting the plea, that you would come back into the Court and Judge Dozier would give you a new trial?

A    Right.

One of the petitioner's trial counsel testified at the hearing, explaining her assessment of the proof which would have been presented against the petitioner at trial:

A    It was not a good case for Mr. Baggett, for a bunch of reasons. Obviously, he had – there was a full statement that he made. He had also made statements to his family and his girlfriend. There was a video tape also of him walking away from the car that was burning.

Q    Would that be the deceased victim's car?

A    The victim's car. Yeah, yeah.

Q    And were there items that were taken from the victim's car?

A    Yes. The speakers were and they were recovered at his girlfriend's house. And she was also one of the people who he had made some statements to about what had happened and she was subpoenaed.

Q    Generally, what type of statements did he make to those individuals?

A    If I recall, when we talked to the girlfriend . . . she told us that when he gave her the speakers, he told her that he had killed the fellow over drugs and money or some such thing. So that was almost as bad if not worse than what he told the police. And his mother, obviously, he just told her what he had done. And there were some extenuating circumstances about, if he had testified, what he would say.

Q    What was that situation?

A    Well, he had issues with his father. And he viewed, sort of, this killing as like a practice run for when he had hoped to kill his father. To see if he could just kill someone who didn't necessarily . . . if there was someone with his dad who he had to kill, as well, if he could just go ahead and do it. So when we heard about that, that's when we got Dr. Caruso involved, hoping that there would be some basis for a diminished capacity defense. And [other trial counsel] actually had most of the dealings with Dr. Caruso, talked to him most. But, you know, obviously, since there's no report, he didn't have anything good to say for [the defendant's] case.

Q    So his testimony –

A    Wouldn't have been helpful.

Q    Most likely would not have been favorable and would not have supported a defense in this case?

A    Right. Right.

Additionally, upon questioning, she explained that counsel had met with the petitioner to discuss the evidence against him:

Q    But you remember specifically going over the contents and having a copy in your presence while you were doing such.

A    That, I do remember. I am pretty sure, though, that we didn't actually watch the video tapes with him. We told [him] what they said, you know, what they showed us. But I don't recall actually sitting and watching them with him and I don't think we did that.

Q    Would that have had, perhaps, something to do with the logistics with where he was presently being held?

-6-

A      Partially, at least.

Q      And in the discovery that you were going through with him and discussing with him, was there, in fact, a detailed summary made by the police officer concerning the contents of that tape?

A      I believe so.

Q      And did he seem to have any difficulty at all remembering having given that statement or the general contents of that statement?

A      I don't think so.

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

By statute in Tennessee, the petitioner at a post-conviction relief hearing has the burden of proving the allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997). A petition based on ineffective assistance of counsel is a single ground for relief, therefore all factual allegations must be presented in one claim. See Tenn. Code Ann. § 40-30-206(d) (1997).

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999), "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

Our supreme court explained in Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002), the showing which a petitioner must make to establish that he was prejudiced by the action or inaction of counsel:

To establish that a deficiency resulted in prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. In short, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. State v. Burns, 6 S.W.3d at 463. In cases involving a guilty plea, a petitioner must establish that but for counsel's deficiency, he would have gone to trial instead of entering the plea of guilty. Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985).

Following the hearing on the post-conviction petition in this matter, the court concluded in writing both that the petitioner had received effective assistance of counsel and that his pleas of guilty were "knowing, intelligent, and voluntary," detailing its findings:

The petitioner testified that while being represented by [trial counsel], he was neither shown any evidence against him nor did counsel explain it to him. The defendant also stated that [trial counsel] advised him to enter the guilty plea and he could then file a petition for Post Conviction in order to receive a new trial. However, the defendant's testimony on cross-examination was in sharp contrast with his testimony offered on direct examination. Specifically, when questioned by the State, the petitioner testified that he had given a full confession to police in this case. The petitioner also stated that he was aware that the evidence against him was not in his favor and if convicted, he could receive a considerable amount of time. More importantly, the petitioner testified that he was aware that he could get a 15% reduction of his sentence if he was entitled to good and honor time.

Noting that the petitioner had signed the guilty plea petition setting out the sentences which would be imposed and that it provided as to each sentence "100% to serve (85% eligibility)," the court set out its question of the petitioner and his response as to the percent of the sentences to be served:

The Court: All right. Do you understand, Mr. Baggett, that the sentences are at one hundred percent? You've put in this plea petition that – and the statu[t]e allows a reduction to eighty-five percent, but that is up to the parole board. In other words, this

sentence is being composed at one hundred percent of this fifty-year sentence you are subject to serving. Do you understand that?

Defendant Baggett: Yes, Sir.

Detailing the testimony of petitioner's trial counsel, and accrediting her testimony rather than that of the petitioner, the post-conviction court then concluded that the petitioner had failed to show that but for counsel's alleged errors, he would not have pled guilty to the two offenses. Thus, the court concluded that the petitioner received effective assistance of counsel and that his pleas of guilty were knowing and voluntary.

The record fully supports these findings and conclusions of the post-conviction court. The guilty plea petition was clear as to what sentences would be imposed, as was the questioning of the petitioner by the court before the sentences were imposed. The petitioner does not suggest what further explanations could have been given as to the fact that the sentences were imposed at 100%, but he could serve as little as 85%, within the discretion of the parole board.

Accordingly, we conclude that the post-conviction court did not err in dismissing the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-10-