IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs December 15, 2004

## KYNASTON SCOTT a.k.a. KYNASTON L. OLAWUMI v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-D-2256     Seth Norman, Judge**

_____

**No. M2004-00809-CCA-R3-PC - Filed Janaury 11, 2005**

_____

The petitioner appeals the dismissal of his petition for post-conviction relief in which he asserted various instances of ineffective assistance of counsel. We affirm the dismissal of the post-conviction petition because the record supports the post-conviction court's findings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Jefre S. Goldtrap, Nashville, Tennessee, for the appellant, Kynaston Scott a.k.a Kynaston L. Olawumi.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Lisa A. Naylor, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

The petitioner, Kynaston L. Scott, appeals the Davidson County Criminal Court's dismissal of his petition for post-conviction relief in which he challenged his convictions of one count of felony murder and one count of first degree murder. After a jury rendered verdicts of guilty, the trial court merged the two counts and imposed an effective sentence of life in prison with the possibility of parole. The conviction and sentence were affirmed by this Court on direct appeal. See State v. Kynaston L. Scott, No. M2001-00707-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 1102 (Tenn. Crim. App., at Nashville, Dec. 20, 2002), perm. to appeal denied (Tenn. 2003). In his post-conviction petition, the petitioner makes several claims of ineffective assistance of trial counsel. We have reviewed the record, the briefs of the parties, and the applicable law. Accordingly, we affirm the post-conviction court's dismissal of the petition.

On appeal, the petitioner claims the following instances of ineffective assistance of counsel:

(1) Failure to investigate the case, factually or legally, in a manner sufficient to be prepared to go forward with all possible defenses and procedures for the petitioner's jury trial;

(2) Errantly advising the petitioner that he should not testify at trial;

(3) Failure to interview and subpoena Eric Jones, Tracy Jenkins, and Rudy Vaughn as witnesses;

(4) Failure to meet with the petitioner for a sufficient amount of time or on a sufficient number of occasions in order to develop a strategy or trial tactic;

(5) Failure to request a continuance of the trial in order to further prepare or to resolve issues with witnesses; and

(6) Failure to meet with the petitioner in order to develop a possible alibi defense and locate and interview and/or subpoena potential alibi witnesses.

The facts of the conviction offenses were gleaned from this Court's direct appeal opinion. See Kynaston Scott.

In the early morning hours of March 29, 1998, the victim, Melvin Sharp, was found slumped behind the wheel of his vehicle in the Second Street area of Nashville. [The victim] had been shot in the head and was dead at the time his body was discovered by police. The [petitioner] was subsequently charged with one count of first degree murder and one count of felony murder.

At trial, Lori M. Sharp testified that in March 1998 she and her husband [the victim] worked at the McDonald's restaurant at 1201 Broadway in Nashville. Lori Sharp was the general manager and [the victim] was her first assistant. The Sharps made the restaurant's bank deposits each day at First American Bank on McGavock Pike. In preparation for deposit, the money was placed in First American deposit bags and each manager had a drop key which was required to make the deposit. However, the couple had only one drop key, which they kept on a separate key ring at their home. The one on duty usually took the key when leaving for work. On March 28, 1998, [the victim] left for work around 4:00 a.m. He did not take the key to work with him that day.

Lori Sharp last spoke with [the victim] around 6:00 to 8:00 p.m. that evening when he called from work to tell her that he planned to stop by his brother's house to eat fish. Lori Sharp related that she and her husband owned a 1995 Mazda 626 which was a "burgundy, reddish color." Her husband had driven the car to work that day. The victim did not carry a wallet, but kept his money, driver's license, Social Security card, and health insurance card in a small "daytimer." After his death, his watch, a cigarette lighter, and sixty to eighty dollars ($60 to $80) were returned to Lori Sharp.

Eyewitnesses Jeffrey Pinchon and Joe Vaughn later identified the petitioner from a photographic lineup as the gunman; a warrant was then issued for the petitioner's arrest.

At the post-conviction hearing, the petitioner stated that he wanted to testify at trial in order to explain an incriminating letter written by the petitioner to his brother. However, the petitioner stated, counsel told him that he felt they had a good chance of winning and that he did not feel the petitioner should testify because that testimony and the State's cross-examination might hurt the defense.

The petitioner also stated that he asked trial counsel about locating Eric Jones as a witness for the defense and that counsel told the petitioner that someone would attempt to get in touch with Jones; however, he never heard anything further regarding the status of Jones as a defense witness. As pertaining to potential witness Rudy Vaughn, the petitioner testified that he requested that counsel file a continuance in order to have time to locate him, but trial counsel failed to do so. The petitioner also testified that he requested that Tracy Jenkins and Yolanda Ursery be called as witnesses for the defense because their statements, combined with other evidence, "would have caused reasonable doubt on [his] behalf." However, these witness were likewise not called on behalf of the petitioner.

The petitioner further avers that, although he met with trial counsel a few times, the two never discussed how they would "go about defending the case when the trial came." Moreover, the petitioner complains that, after receiving a plea offer that he felt was unacceptable, trial counsel failed to relay any counteroffer on his behalf.

The petitioner also argues that trial counsel did not have enough time to prepare for trial. The petitioner testified that trial counsel errantly failed to request a continuance, even though the petitioner felt more time was necessary to locate all potential witnesses and to adequately prepare for trial. Finally, the petitioner avers that he discussed a potential alibi defense with trial counsel; however, counsel failed to develop an alibi theory and opted not to call the petitioner's father, a potential alibi witness, to the stand.

On cross-examination, the petitioner admitted that there were several continuances for various reasons from the time of his arrest until trial. He further affirmed the fact that he had a number of different attorneys represent him up to the time of trial and that all prior counsel provided the work they had done on his case to trial counsel. The petitioner further admitted that, among the work done by previous attorneys and turned over to trial counsel, was an investigation of the case and an interview conducted with eyewitness Jeffrey Pinshon. Finally, the petitioner acknowledged that the State intended to call Eric Jones, Yolanda Ursery, and Tracy Jenkins as witnesses against the petitioner at trial.

Trial counsel stated at the post-conviction hearing that he was appointed in December before the trial in February 2001. He testified that, in an effort to gain information on the case, he spoke with the petitioner's previous counsel on the matter and conducted his own investigation with the aid of Investigator Pat Wells. As part of his independent investigation, counsel testified that he located and interviewed several witnesses and spoke with the petitioner on numerous occasions. Trial counsel further noted that he had a good grasp of the evidence and felt he was well prepared for trial.

Pertaining to the issue of the petitioner testifying, trial counsel stated that he was concerned about going to trial based on the overwhelming nature of the State's evidence. Specifically, counsel testified that he was concerned about the petitioner being cross-examined about the incriminating letter written by the petitioner to his brother; he stated that he told the petitioner that it would not be in his best interest to testify at trial.

Although trial counsel stated that he did not remember Eric Jones, he testified that he attempted, along with the State, to locate Rudy Vaughn. Despite efforts to locate him through the Department of Children's Services, trial counsel stated that he was unable to find him. Counsel further testified that he met with the petitioner "many times," estimating that he visited the petitioner eight to ten times, and possibly more. He further stated that he conveyed his concerns about the strength of the State's case "as clearly as [he] could" and that he discussed his trial strategy of attempting to discredit the State's witnesses with the petitioner. Finally, he testified that, although he discussed the State's settlement offer with the petitioner, the petitioner had "a gut feeling that he was going to be able to win this case at trial or that he was going to put his faith in the Lord . . . He was convinced that we were going to be able to win this case at trial."

Although counsel testified that he did not recall requesting a continuance in the case, he acknowledged on cross-examination that he was aware that the prosecution wanted to expedite the trial and that the State planned to call two out-of-state witnesses. Regarding the existence of a possible alibi defense, trial counsel initially testified that he could not recall if the petitioner raised the possibility of an alibi defense in their conversations. He further stated that he did locate and interview the petitioner's parents, both of whom the petitioner avers could have supplied an alibi. However, counsel testified that he remembered having a conflict with the introduction of that testimony, although he could not recall the particular conflict at the time of the hearing. Counsel further affirmed that he would have called the petitioner's father to the stand if he had felt he was a legitimate alibi witness.

The petitioner's parents also testified on his behalf at the post-conviction hearing. The petitioner's mother testified that she recalled the petitioner arriving at home at approximately 10:00 p.m. on the night of the murder but "could not tell [post-conviction counsel] anything else after that." She further testified that she discussed these matters with trial counsel, but that the issue of her testifying "didn't even come up." She admitted on cross-examination that she suffered from grand mal and petit mal seizures, which affected her short-term and long-term memory. She also contradicted her earlier statement on cross-examination by testifying that she was unable to verify that trial counsel did, indeed, meet with her.

The petitioner's father testified that the petitioner had arrived home at approximately 10:00 p.m. and, to the best of his knowledge, had not left thereafter. He also stated that he left for work shortly before 5:30 a.m. the next morning and that he believed the petitioner was still at home at that time.

The post-conviction court found that trial counsel had adequate time to prepare for trial considering the fact that the petitioner's previous attorney provided trial counsel with all

research and other work conducted on the case to that point. The court further found that counsel used appropriate discretion in advising the petitioner not to testify. Although the petitioner admittedly knew of his right to testify, he opted to follow the advice of trial counsel, who was fearful that he would be exposed to rigorous cross-examination. The court also found that, despite a diligent effort by both trial counsel and the State, they were unable to locate potential witness Rudy Vaughn. Moreover, the court noted that the State intended to call Eric Jones and Tracy Jenkins to testify against the petitioner; therefore it stood to reason that their presence would not have aided the defense. Finally, the court found that it could not find trial counsel ineffective in light of the fact that the witnesses in question were not called to testify at the post-conviction hearing. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

In answering the petitioner's last contention, the court found that, although counsel interviewed the petitioner's parents, he was "unable to craft an alibi defense based on the testimony of petitioner's parents." Further, the court noted that the petitioner's father testified at the post-conviction hearing that his son was definitely at home at the time of the murder, which contradicted an earlier statement given to police, in which he stated that he could not verify the presence of the petitioner at the time of the murder. The court thus found that it could not hold trial counsel ineffective for failing to present the statement which conflicted with the existing evidence at the time of the trial.

**Analysis**

When a claim of ineffective assistance of counsel is made under the Sixth Amendment, the burden is upon the complaining party to show that (1) counsel's performance was deficient, and (2) the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court required that the services be rendered within the range of competence demanded of attorneys in criminal cases. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002).

It is unnecessary for a court to address deficiency and prejudice in any particular order or even to address both if the petitioner makes an insufficient showing on either. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the petitioner must establish a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068) (citations omitted).

The petitioner bears the burden of proving the factual allegations that would entitle the petitioner to relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2004).

We review the post-conviction court's factual findings underlying a claim of ineffective assistance of counsel under a *de novo* standard with a presumption that those findings are correct – unless the preponderance of the evidence establishes otherwise. Burns, 6 S.W.3d at 461. However, the post-conviction court's conclusions of law – such as whether counsel's performance was deficient or whether that deficiency was prejudicial – are reviewed under a *de novo* standard with no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457 (Tenn. 2001) (citations omitted).

We conclude that the record supports the post-conviction court's findings and its dismissal of the petition. First, the petitioner failed to establish that trial counsel inadequately investigated the case or was unprepared to proceed with all possible defenses. We agree with the post-conviction court that previous counsel had performed ample investigation and research and that work was passed on to trial counsel. Moreover, counsel prepared independently, with the aid of an investigator, by interviewing witnesses, visiting the crime scene, and formulating the best possible defense for the petitioner.

As to the petitioner's second contention, we conclude that trial counsel was not ineffective in advising the petitioner not to testify at trial. Again, we agree with the post-conviction court that counsel used proper discretion in advising the petitioner in this way when he was concerned with the detrimental effect of the petitioner's testimony and the likely stringent cross-examination of the petitioner. We further note that the petitioner knew he had the right to testify but chose instead to follow the advice of his attorney. We hold that trial counsel was not ineffective in this regard.

Third, we conclude, as did the post-conviction court, that trial counsel was not ineffective for failing to locate and subpoena potential witnesses, Rudy Vaughn, Eric Jones, and Tracy Jenkins. The record reflects that every effort was made to locate Rudy Vaughn; however, despite the best efforts of both the State and trial counsel, he was never found. As to Eric Jones and Tracy Jenkins, the petitioner failed to present their testimony at the post-conviction proceedings. As such, we cannot "speculate or guess . . . what a witness's testimony might have been if introduced by defense counsel." Black v. State, 794 S.W.2d at 757. Moreover, we note that the State intended to call these two witnesses to testify against the petitioner. We agree with the post-conviction court that it "does not follow that their presence would have assisted the petitioner in his defense."

Regarding the petitioner's contention that counsel did not adequately meet with the petitioner, we again agree with the post-conviction court that counsel was not ineffective with respect to this issue. Counsel met with the petitioner at least eight to ten times within the span of the two months he represented the petitioner prior to trial. Further, the post-conviction court credited trial counsel's testimony that he adequately discussed the trial strategy, the State's evidence, and the prosecution's plea offer in his meetings with the petitioner. We conclude that trial counsel amply met and communicated with the petitioner; therefore, he was not ineffective.

Next, the petitioner contends that trial counsel was ineffective in failing to request a continuance to further prepare his case. We reiterate the fact that trial counsel was given the

-6-

benefit of prior counsel's research and investigation. Moreover, counsel had two months in which he was able to conduct his own investigation, interview witnesses, and form a trial strategy. We further note that several continuances had already been granted prior to trial counsel's appointment and that the prosecution was eager to present its case, which included two out-of-state witnesses. Considering all of these facts, we conclude that trial counsel was able to sufficiently prepare and that the case was ready to go forward. Therefore, any failure to request a continuance did not amount to ineffective assistance of counsel.

Finally, the petitioner asserts that trial counsel was ineffective for failing to interview potential alibi witnesses and failing to develop an alibi theory for trial. However we, like the trial court, conclude that counsel did properly interview the supposed alibi witnesses but could not "craft an alibi defense based on the testimony of the petitioner's parents." The record shows that the petitioner's mother suffered from petit mal and grand mal seizures which affected her memory. In fact, the petitioner's mother contradicted her own direct examination testimony on cross-examination during the post-conviction hearing. Although the defendant's father testified that he believed his son was at home when the murder occurred, this testimony contradicts an earlier statement given by the petitioner's father to police, in which he stated that he could not verify that the petitioner was at home when the crime was committed. Like the post-conviction court, we hold that counsel cannot be held ineffective for failing to present evidence that was contrary to evidence existing at the time of trial.

In conclusion, it appears from the record that trial counsel made every effort to provide the petitioner with the best defense possible. Counsel testified that he attempted to impeach witnesses, suppress statements made by the petitioner, and present exculpatory reasons for the petitioner's questionable departure out-of-state on the day after the murder. By all accounts, counsel was concerned about the prospects of taking the case to trial due to the overwhelming amount of evidence against the petitioner. However, because the petitioner wanted to go to trial, trial counsel made every effort to form a sound trial strategy. As the post-conviction court noted: "Simply because counsel's strategy proved unsuccessful does not constitute ineffective assistance of counsel." See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997).

## Conclusion

Because the record supports the post-conviction court's findings that the petitioner failed to establish his claims by clear and convincing evidence, we affirm the dismissal of the post-conviction petition.

_____
JOHN EVERETT WILLIAMS, JUDGE