IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 17, 2011

## WILLIAM B. FRANCIS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2005-C-2419     J. Randall Wyatt, Jr., Judge**

_____

**No. M2010-01062-CCA-R3-PC - Filed June 9, 2011**

_____

In 2006, a jury convicted the petitioner, William B. Francis, of second degree murder, a Class A felony, and the trial court sentenced him as a Range I, violent offender to twenty-five years in the Tennessee Department of Correction. A panel of this court affirmed his conviction and sentence. *See State v. William B. Francis, Jr.*, No. M2006-02177-CCA-R3-CD, 2007 WL 4224629, at *1 (Tenn. Crim. App., at Nashville, Nov. 30, 2007). In his post-conviction petition, the petitioner alleged ineffective assistance of counsel. The post-conviction court denied relief. On appeal, the petitioner argues that his counsel were ineffective for failing to present a complete defense and for not preventing the state from referring to the petitioner's residence as a halfway house. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Ashley Preston, Nashville, Tennessee, for the appellant, William B. Francis.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Victor S. Johnson III, District Attorney General; Amy Eisenbeck and Katrin Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Background**

*Trial*

A jury convicted the petitioner, William B. Francis, of the July 2, 2005, second degree murder of Davenia Grant, his girlfriend. *See State v. William B. Francis, Jr.*, No. M2006-02177-CCA-R3-CD, 2007 WL 4224629, at *1 (Tenn. Crim. App., at Nashville, Nov. 30, 2007). The panel of this court that heard the petitioner's direct appeal summarized the facts of the case:

> According to witnesses, the victim visited the [petitioner] at the halfway house where he had been living for several months. The two went into the [petitioner]'s room, and witnesses then heard sounds of a struggle coming from the room. Johnny Campbell and Raymond Perez, residents of the halfway house, inquired into the well-being of the [petitioner] and the victim, and the [petitioner] responded that everything was "fine." Both Mr. Campbell and Mr. Perez confirmed that they heard the victim tell the [petitioner], "Stop." A short time later, Mr. Perez heard the [petitioner] in the kitchen and then saw him move the victim's car to the opposite side of the street. He then told Mr. Perez, "[W]e're leaving," and left in the victim's car alone.
>
> When Mr. Perez realized that the victim did not leave with the [petitioner], he went into the bedroom to check on her. He eventually saw her body in the [petitioner]'s closet wrapped in blankets. Mr. Perez testified that he had seen the [petitioner] spread those same blankets on the floor just prior to the victim's arrival. After Mr. Perez alerted Mr. Campbell to the presence of the victim's body, Mr. Campbell telephoned the police and the house manager, Milton McClain.
>
> Lieutenant Aubrey Turner of the Metro Police Department was the first officer on the scene. He was directed to the [petitioner]'s closet, where he discovered the victim's still warm body underneath a blanket that had been "folded perfectly." Tennis shoes and other items had also been arranged neatly on top of the victim's body.
>
> Doctor Stacy Turner testified that the cause of death was "multiple sharp force injuries," four of which were stab wounds. Two stab wounds to the neck were "potentially lethal." Doctor Turner classified incisions and abrasions to the victim's face and hands as defensive wounds. Doctor Turner confirmed that the victim was not pregnant at the time of her death. Testing revealed the presence of both parent cocaine and cocaine metabolites in the victim's blood.

Rutherford County Deputy Sheriff David Alford found the [petitioner] sitting in the victim's car in his parents' driveway. Clothing had been rolled up in the windows to form a curtain concealing the interior of the car.

Both Mr. Campbell and Mr. Perez testified that the [petitioner]'s relationship with the victim was rocky. Mr. Campbell stated that the [petitioner] displayed "rough" behavior toward the victim while the [petitioner] and the victim were on the telephone. He recalled that after one conversation with the victim, the [petitioner] threatened to "kill that bitch," but no one took him seriously. He conceded that he never heard the [petitioner] communicate any threat to the victim. Mr. Perez, who was the [petitioner]'s roommate, testified that he heard the [petitioner] arguing with the victim while on the telephone. Approximately two weeks before the murder, the [petitioner] told Mr. Perez that the victim was pregnant and that he did not believe that they should bring another child into the world. He told Mr. Perez that he was going to kill the victim or cause her to miscarry. The victim's cousin, Marjorie Tyler Grant, also overheard the [petitioner] and the victim arguing on several occasions. She recalled that on the day that the [petitioner] and the victim went to court regarding the order of protection the victim took on the [petitioner], the [petitioner] told the victim "[I]f I can't have you, no one else can." Over defense objections, the State introduced into evidence a certified copy of the [petitioner]'s conviction for assaulting the victim in March 2005 and a certified copy of the order of protection.

Metro Detective Robert Russell interviewed the [petitioner] and recorded his statement. According to Detective Russell, the [petitioner] admitted killing the victim but claimed that he did not intend to kill her. The [petitioner] claimed that the victim pulled a knife on him as they argued about money. He stated that he was able to gain control of the knife and stab the victim.

*Id.* at *1-2. This court affirmed the petitioner's conviction and sentence. *Id.* at *1. The supreme court denied his application for permission to appeal on April 14, 2008. *Id.*

*Post-Conviction*

The petitioner filed his original petition for post-conviction relief on October 9, 2008. The post-conviction court appointed counsel, who filed an amended petition on December 9, 2008. The post-conviction court held a hearing on the petition on March 15, 2010, at which the petitioner and counsel A testified.

The petitioner testified that two attorneys from the public defender's office represented him at trial, counsel A and counsel B. He said that they met with him at the county jail "from time-to-time." The petitioner testified that the victim was stabbed while he was fighting her for the knife with which she attacked him. He said that he told his version of her death to counsel, including that the victim produced the knife. The petitioner said that he sustained injuries on his hands, neck, and chest during the struggle. He testified that counsel took pictures of the injuries but did not show the pictures at trial. The petitioner testified that his understanding of the defense strategy was that counsel would show that he was sorry for the situation. He agreed that the court instructed the jury regarding self-defense, but he stated that the jury did not have enough evidence to consider self-defense.

The petitioner said that he did not testify at trial because his understanding was that his testifying would result in greater punishment. He believed that the jury would have reached a different conclusion if he had testified and that it was a mistake for his counsel to advise him against testifying.

The petitioner recalled that one of the state's witnesses and one of the district attorneys general characterized his residence as a halfway house. He agreed that it was a halfway house but alleged that presenting it as such damaged him in the view of the jury because it appeared that he was there because of substance abuse or under court order. The petitioner testified that he lived at the halfway house voluntarily, to help the people who lived there. He believed that if the jury had heard why he lived there, it would have put him in a better light.

Counsel A testified that he had practiced exclusively criminal law with the public defender's office for approximately ten years prior to the petitioner's case. Counsel B assisted him with this case. Counsel A testified that he spent approximately 160 hours on the petitioner's case and met with the petitioner approximately twenty times. He recalled discussing the petitioner's self-defense theory, but in his opinion, it would have been difficult to explain the petitioner's theory to the jury considering the evidence against him. Counsel A agreed that the petitioner's statement to the police, which the state introduced at trial, showed that the petitioner told the police that he acted in self-defense. He further agreed that the court charged the jury with the self-defense instruction. Counsel A testified that the public defender's office investigator took pictures of the petitioner's injuries, but Counsel A was unable to see any injuries in the pictures. He said that they took the pictures in October 2005, several months after the incident. He said that he should have taken the pictures sooner, but he did not recall seeing any injuries at the petitioner's preliminary hearing. Counsel A stated that he believed that pictures that did not display injuries would have hurt the petitioner with the jury. He testified that he and the petitioner discussed whether the petitioner would testify, and it was the petitioner's decision not to testify.

Counsel A stated that he never told the petitioner that his sentencing range would increase if he testified.

On cross-examination, Counsel A testified that they included self-defense in their defense strategy but "were more leaning towards a voluntary manslaughter type argument . . . because we felt the proof would be very difficult for self-defense." Counsel A clarified that he wished that he had taken the pictures of the defendant's hands earlier, but he said that "the problem [was] just [he] couldn't really see much of anything," despite the petitioner's insistence that he was injured and that he was still injured in October, when the pictures were taken. Counsel A said that the only proof presented at trial that the victim pulled the knife first was the petitioner's statement to police. He testified that the only other person who could have testified in that regard would have been the petitioner. Counsel A said that he and counsel B thoroughly discussed the pros and cons of the petitioner's testifying, and they used a motion hearing as a "dry run" to see how the petitioner might testify. Counsel A said that the petitioner was "evasive and willing to say anything to get out of trouble" during the motion hearing testimony, so they strongly advised him against testifying. Counsel A testified that he was aware that the petitioner voluntarily lived in the halfway house. He said that he should have filed a motion in limine to prevent the state from referring to the residence as a halfway house. He recalled objecting when the police detective began testifying about the halfway house, and the court instructed the state to refrain from referring to the residence as a halfway house. Counsel A said that he did not continue to object to such references, but he could not recall whether the decision not to object was a strategic decision. He agreed that nothing was done to clarify for the jury that the petitioner lived in the halfway house voluntarily.

The post-conviction court denied post-conviction relief in an order filed April 12, 2010. Regarding the petitioner's claim that counsel failed to present a comprehensive trial strategy, the post-conviction court found little evidence in the record to support a self-defense strategy and remarked that presenting self-defense "as the sole defense might have appeared disingenuous to the jury." The court found that counsel presented a reasonable defense by attempting to mitigate any notion of premeditation. Regarding the claim that counsel failed to timely object to the state's use of the term "halfway house," the court found that counsel's objection was sufficient and further objection might have inflamed the jury. The court stated that failure to file a motion in limine on that issue did not place counsel's representation below the range of competence of an attorney in a criminal case.

The petitioner moved this court to waive the thirty-day limit for filing a notice of appeal. This court found, under Tennessee Rule of Appellate Procedure 4(a), that waiver

was appropriate in this case and granted the motion. Subsequently, the petitioner filed his notice of appeal on June 21, 2010.[1]

## Analysis

The petitioner argues that he was denied the effective representation of counsel. Specifically, he contends that counsel failed to present a comprehensive trial strategy by not presenting a self-defense theory, which would have been bolstered by the petitioner's testimony and photographs of his defensive injuries. He further contends that counsel's failure to file a motion in limine or to timely object during trial to the state's characterization of the petitioner's residence as a halfway house demonstrated counsel's ineffective assistance.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is bound by the post-conviction court's findings of fact unless the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings is *de novo* with a presumption that the findings are correct. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). Our review of the post-conviction court's legal conclusions and application of law to facts is de novo without a presumption of correctness. *Id.*

To establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols. v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Once the petitioner proves

---

[1] The state urges this court to dismiss this appeal based on the late-filed notice of appeal; however, this argument is moot in light of this court's previous order waiving the time limitation.

that counsel's representation fell below a reasonable standard, the petitioner must also prove prejudice. *Strickland*, 466 U.S. at 694. Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Id.* Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Id.* at 697. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id.*

Regarding the petitioner's contention that counsel were ineffective for failing to develop and present a comprehensive trial strategy, counsel A testified that the defense strategy, essentially, was to show that the petitioner did not premeditate the killing. Counsel A testified that they decided not to pursue self-defense as the sole strategy because of the difficulty presenting that theory to the jury in light of the proof against the petitioner. Counsel A further testified that, while it might have been better for him to take pictures of alleged defensive wounds sooner than October 2005, he never saw any such wounds on the petitioner. Counsel A's testimony, as accredited by the post-conviction court, was that counsel fully advised the petitioner about his right to testify and never led the petitioner to believe that his sentencing range would increase. Furthermore, counsel's advice to petitioner that he not testify was based on petitioner's testimony at a motions hearing. Additionally, the jury heard the petitioner's self-defense theory through admission of his statement to police, and the trial court gave the jury the self-defense instruction. Therefore, we conclude that counsel developed a comprehensive strategy that included decisions to not solely pursue a self-defense theory, to not present photographs that did not display defensive injuries, and to advise the petitioner not to testify. Counsel's strategy was successful insofar as the jury acquitted the petitioner of first degree murder. We defer to counsel's informed strategy and conclude that the petitioner has not shown that counsel was ineffective for failing to develop and present a comprehensive trial strategy. *See Hellard*, 629 S.W.2d at 9.

As for the allegation that counsel should have filed a motion in limine to prevent the state from referring to the petitioner's residence as a halfway house, we conclude that the petitioner has not shown any proof that there is a reasonable probability that the result would have been different but for the error. Because the petitioner has not proven the prejudice prong of the *Strickland* analysis, we decline to determine whether such error amounted to deficient performance. *Strickland*, 466 U.S. at 697. Therefore, the petitioner is without relief in this matter.

**Conclusion**

Based on the foregoing reasons, we affirm the denial of post-conviction relief.

_____

J.C. McLIN, JUDGE