IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 17, 2011

**JERRY LEE HUNTER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Marshall County**
**No. 2010-CR-120     Robert G. Crigler, Judge**

_____

**No. M2011-00230-CCA-R3-PC - Filed August 31, 2012**

_____

The Petitioner, Jerry Lee Hunter, appeals the Marshall County Circuit Court's denial of post-conviction relief from his conviction for especially aggravated robbery, for which he is serving an eighteen-year sentence. The Petitioner contends that his entry of a guilty plea was unknowing, involuntary, and unintelligent because he did not receive the effective assistance of counsel. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and DONALD P. HARRIS, SR.J., joined.[1]

Emeterio Hernando, Lewisburg, Tennessee, for the appellant, Jerry Lee Hunter.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Petitioner was indicted for attempted first degree murder, especially aggravated burglary, and especially aggravated robbery. The State dismissed the first two counts, and the Petitioner pleaded guilty to especially aggravated robbery on June 28, 2010, the day his case was set for trial.

_____

[1] JUDGE J.C. MCLIN was originally on the panel to which this case was assigned. Judge McLin died September 3, 2011, and we acknowledge his faithful service to this Court.

According to the prosecutor's recitation of facts at the guilty plea hearing, on December 3, 2009, the victim was at his home with the Petitioner and others. The victim and his guests had been drinking. The Petitioner was giving the victim a tattoo. There was an argument lasting several hours about the tattoo, payment, and whether the Petitioner should finish the tattoo. The victim told the Petitioner to leave his home. When the victim paid the Petitioner for the tattoo, the Petitioner noticed $150 in the victim's wallet.

At approximately 7:00 p.m., the victim was asleep in his kitchen and felt someone touching his foot. He awoke and saw the Petitioner standing above him. He asked the Petitioner what he was doing in his home. The Petitioner said he was going to cut the victim's throat. The Petitioner grabbed the victim by his shirt and cut him twice with a knife. The Petitioner took the victim's wallet and a bottle of vodka and left the home. The Petitioner went to his home nearby. The victim went to a neighbor's house, told his neighbor that his throat had been cut, and lost consciousness. The neighbor called 9-1-1 and used a towel compress on the victim's wounds. After the police and an ambulance arrived, the victim was taken by helicopter to Vanderbilt Hospital.

When questioned by the police, the Petitioner's daughter identified the Petitioner as a suspect and said that the Petitioner mentioned robbing the victim. The Petitioner's daughter's boyfriend said that the Petitioner asked him to help rob the victim. He said that after he refused, the Petitioner left but returned ten minutes later covered in blood. The Petitioner gave him a wallet and told him not to say anything. He threw the wallet on a neighbor's roof.

The Petitioner told the police that he and the victim argued at the victim's home. Police officers found the victim's bloody wallet on the Petitioner's neighbor's roof. Police officers searched the victim's home and the Petitioner's home and found blue rubber gloves in each. The officers found a knife on top of the Petitioner's tattoo bag. The blood from the knife was later identified through DNA testing as the victim's.

At the guilty plea hearing, the Petitioner affirmed his understanding of the nature of the charge and the range of punishment. The Petitioner acknowledged that trial counsel explained the charges and range of punishment and that counsel negotiated and explained the plea agreement. The Petitioner denied that anyone threatened or induced him to enter the guilty plea and said that he was entering his plea freely and voluntarily. The Petitioner understood that the convictions could be used to enhance his punishment for any later conviction. The Petitioner acknowledged that he was waiving his rights to a jury trial and to an appeal by pleading guilty. The Petitioner denied having any complaints about trial counsel's representation. The trial court found that the Petitioner was competent to enter his guilty plea and that the Petitioner entered his guilty plea freely, voluntarily, and

understandingly. The trial court found a sufficient factual basis for the plea, accepted the plea, entered the judgment of conviction, and sentenced the Petitioner to the agreed sentence of eighteen years.

The Petitioner filed a pro se post-conviction petition alleging that trial counsel was ineffective because he did not explain the relevant law to the Petitioner, that the Petitioner's guilty plea was not knowingly, voluntarily, and understandingly entered, and that the trial court erred in imposing the eighteen-year, 100% sentence in light of the Petitioner's unspecified medical condition. After counsel was appointed, the Petitioner filed an amended petition in which he alleged that trial counsel incorrectly informed him that he could be paroled in seven years and that trial counsel failed to interview a witness, Christie Colbert.

At the post-conviction hearing, the Petitioner testified that he wanted to withdraw his guilty plea due to the ineffective assistance he received in the conviction proceedings. He said he decided to plead guilty after a jury was selected for his trial. He said that he met with his trial attorneys and an assistant district attorney and that his trial attorneys and the prosecutor told him he would be released in seven to eight years if he accepted the plea agreement calling for an eighteen-year, 100% sentence and if he behaved himself while confined. He said they explained the severity of the offenses and told him that he was facing a possible sentence of up to sixty years if the jury convicted him. He acknowledged that he read the entire "Petition to Enter Plea of Guilty." He admitted the petition stated that his sentence would be eighteen years to be served at 100%. He said he did not complain when the trial court asked him if anyone made any promises in exchange for his plea because "[t]here weren't any promises made." He explained, "They told me if I went in and laid down for seven or eight years I could possibly get back out. That is not a promise." The Petitioner said the legal advisor in the penitentiary library later told him that he would have to serve at least sixteen to seventeen years before he would be released and that the only good time credits he would receive "knocked it down to 85 percent."

On cross-examination, the Petitioner testified that the State did not offer him a plea agreement before the day of trial. He agreed that before jury selection, he asked his counsel to speak with the State about the possibility of a settlement but that the prosecutor declined to discuss a settlement until after the jury was selected.

The Petitioner agreed that his first plea offer to the State was for a sentence of less than eighteen years and that the prosecutor said the State would consider a sentence of twenty to twenty-five years. The Petitioner agreed that he asked for a sentence that would not require him to die in prison and that the parties eventually agreed on an eighteen-year sentence. The Petitioner recalled the prosecutor telling him with defense counsel present that the sentence was at 100% but that he might be released in seven or eight years. The

Petitioner said the prosecutor told him that he was facing sixty years in prison if the jury convicted him. The Petitioner said his guilty plea transcript was accurate. The Petitioner agreed that he signed the guilty plea petition and that it stated the sentence was eighteen years at 100%.

Trial counsel testified that he and co-counsel were prepared to go to trial because the Petitioner wanted a trial. He thought the Petitioner asked them to approach the State about a plea agreement after the jury was selected. He denied that he or anyone else told the Petitioner that by accepting the eighteen-year sentence at 100% the Petitioner would be released in seven to eight years, assuming good behavior. He recalled that the Petitioner wanted a plea agreement for a sentence of twelve years at 30% service or fifteen years at 100%, but the State refused both offers. He said the prosecutor offered a settlement for a sentence of twenty or twenty-two years. After discussion, they arrived at eighteen years at 100%. Trial counsel said he explained to the Petitioner that the Petitioner would have to serve 100% of his sentence, aside from the possibility of 15% credit for good behavior.

Co-counsel testified that he was present during the plea negotiations with the State and denied that he or trial counsel told the Petitioner that if the Petitioner behaved well while incarcerated, he would only have to serve seven to eight years of an eighteen-year sentence. On cross-examination, co-counsel agreed that there was little movement for a settlement before the trial date. He said that he and trial counsel approached the prosecutor about a plea offer but that the prosecutor wanted to select the jury first because they might not be able to reach a settlement. Co-counsel said that he, trial counsel, the prosecutor, Detective David Henley, and the Petitioner met to discuss a settlement. The State refused the Petitioner's offer to plead guilty in exchange for a fifteen-year sentence. The prosecutor said the State would consider twenty-two years at 100%. The Petitioner said that he would die in the penitentiary if he accepted the State's offer of twenty-two years. The parties negotiated and arrived at an eighteen-year sentence to be served at 100%. He recalled advising the Petitioner that it "was guesswork on my part" whether the Petitioner would be released from prison someday. Co-counsel said that no one in the room told the Petitioner he would be released in seven or eight years.

The trial court took judicial notice of the Petitioner's classification report demonstrating the Petitioner's "familiarity with the criminal justice system" and noted that the transcript of the plea hearing reflected that both the prosecutor and the court stated that the sentence was eighteen years at 100%. The court accredited the testimony of trial counsel and co-counsel and denied post-conviction relief. This appeal followed.

The Petitioner has the burden in a post-conviction proceeding to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, the

trial court's findings of fact bind this court unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Courts may only grant post-conviction relief if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2006).

# I

The Petitioner contends that his guilty plea was not knowing, understanding, and voluntary because he received incorrect information from his attorneys and that he did not fully understand the nature and consequences of his guilty plea due to the misinformation. The State counters that the trial court appropriately accredited trial and co-counsel's testimony that they informed the Petitioner about his sentence and that the Petitioner failed to show that he did not enter his plea knowingly, intelligently, and voluntarily. We agree with the State.

When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. See State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). The circumstances include:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." Blankenship, 858 S.W.2d at 904. A petitioner's solemn declaration in open court that his or her plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations "carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74 (1977).

The record reflects that the Petitioner's trial attorneys discussed the case, the charges, and possible sentences with him. The sentence of eighteen years at 100% was announced during the guilty plea hearing. We note that the Petitioner testified that he entered his plea freely and voluntarily and that he understood the charge, the range of punishment, and the rights he waived upon pleading guilty. After the court accepted the agreement, the jury was brought into the courtroom and the court explained the plea agreement to the jurors before court adjourned. At the post-conviction hearing, the trial court found that the Petitioner's classification report showed several convictions, demonstrating his familiarity with criminal proceedings. The court accredited trial counsel's and co-counsel's testimony over that of the Petitioner. The evidence does not preponderate against the trial court's findings of fact. Those findings support the court's conclusion that the Petitioner failed to show that he did not knowingly, intelligently, and voluntarily enter his guilty plea. He is not entitled to relief on this issue.

**II**

The Petitioner also contends that he did not receive the effective assistance of counsel. The State responds that the Petitioner failed to show that his attorneys performed deficiently or that he was prejudiced. We agree with the State.

To establish ineffective assistance of counsel, a petitioner must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Arnold v. State, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. Strickland, 466 U.S. at 688; see Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694. If a petitioner fails to establish either element of ineffective assistance of counsel, a court need not address the other element. Id. at 697; see also Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Also, a fair assessment of counsel's performance, "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. Goad, 938 S.W.2d at 369. However, deference is given to strategy and tactical decisions only if the decisions are informed ones based upon adequate preparation. Id. (citations omitted).

The United States Supreme Court, in <u>Hill v. Lockhart</u>, 474 U.S. 52 (1985), applied the two-part <u>Strickland</u> standard to ineffective assistance of counsel claims arising out of a guilty plea. The <u>Hill</u> court modified the prejudice requirement by requiring that a petitioner to show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. 474 U.S. at 59; <u>Nichols</u>, 90 S.W.3d at 587.

As we have noted, the record reflects that the Petitioner was advised repeatedly that his sentence would be eighteen years at 100% service. The Petitioner's desire was to avoid dying in prison. Counsel testified that he told the Petitioner he could not predict whether the Petitioner would ever be released. The trial court accredited trial counsel's testimony. The record supports the trial court's factual findings, which in turn support the court's conclusion that the Petitioner failed to prove his ineffective assistance claim. The Petitioner is not entitled to relief on this issue.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE